MARSHALL and another vs. PINKHAM.

*May 16 — June 22, 1881.*

*(1–6) Infringement of trade-mark.  (7) Injunctions in such cases.  (8) Acquisition of title to personalty under will.*

1. Words in common use, merely descriptive of the character, composition or quality of the article to which they are applied, cannot be exclusively appropriated and protected as a trade-mark.

2. The office of a trade-mark is to point out the true origin or ownership of the goods to which it is applied, or to designate the dealer's place of business.

3. The ground upon which actions for the infringement of a trade-mark are maintained is, that the law will not allow one person to sell his own goods as and for the goods of another.

4. The fact that an article, prepared according to a certain recipe, but not protected by a patent, has for some time been made and sold only by a certain manufacturer, does not render it unlawful for any other person, acquainted with its composition, from manufacturing and selling the same.

5. The proper name of the manufacturer of an article cannot be made a trade-mark so as to prevent any other manufacturer of the same name from affixing such name to a similar article made and sold by him, where no unfair means are used to mislead purchasers into a belief that such article is manufactured by the person who first sold and continues to sell a like article under that name.

6. M., having a recipe (not discovered or invented by himself, or protected by a patent) for a liniment used for the cure of rheumatism and other diseases, communicated it to the various members of his numerous family, and permitted each of them, for his or her own benefit to manufacture the article, and sell it with a certain label attached (furnished by M.) containing the words "Old Dr. M.'s Celebrated Liniment," and certain other words descriptive of the liniment, and a certain vignette, and with the address of the particular member of the family manufacturing the article at the bottom of such label.  Each member of the family engaged in such manufacture appears to have had, by their mutual agreement, some particular route or routes to which his sales were confined.  After M.'s death, his widow continued for some years to manufacture the liniment, and to sell it (with said label attached) on the routes last occupied by M.; and she then sold the material and paraphernalia of her business to the plaintiff, one of the sons of M.  *Held,* that plaintiff has no exclusive right as against the other children of M., or

their assigns (nor even as against the public generally), to manufacture said liniment or to the use of said label or the name " M." as descriptive of the article sold.

7. An injunction restraining the use of a trade-mark will not be granted upon the pleadings in a doubtful case; but the court will wait until the proofs are heard.

8. Where there is a will, but no executor named therein, and no administration had, no title to personal property of the testator can be acquired under the will.

APPEAL from the Circuit Court for *Fond du Lac* County.

This was an action by *Charles H. Marshall* and *Mary W.*, his wife, to restrain the defendant and his servants and agents from preparing, putting up or offering for sale a certain alleged imitation of " Marshall's Rheumatic Liniment," or any compound bearing the name of Marshall's Liniment or any imitation of said name, or bearing certain labels described in the complaint, or any imitation of plaintiffs' label or trade-mark; and also to have defendant adjudged to account to plaintiffs for all profits realized by him upon previous sales of said compound sold by him with any imitation of plaintiffs' labels or trade-mark, etc. The case is thus stated by Mr. Justice CASSODAY:

"It is very difficult, if not impossible, to gather from the printed case, or bill of exceptions, or briefs of counsel, an accurate history of the several labels in question. It would seem, however, that about 1857 Samuel Marshall and his wife, Mary J. Marshall, the parents of the plaintiff *Charles H.*, resided at Fond du Lac with seven children, and in rather straitened circumstances. Three of the children were boys — John W., Samuel A., and *Charles H.;* and four were daughters, all of whom were subsequently married. One, Sarah G., became Mrs. Warren, then Mrs. Benson; another, Mrs. Harris; another, Mrs. Haidee A. Robinson; and another, Mrs. Julia F. Smith. Mrs. Smith testified that she was the youngest of the family, and thirty-five years of age, and lived with her father until 1868, when she was married; from which we may

infer that she was born in 1844 or '5, and left her father's when she was about twenty-three. *Charles H.* testified that he was born in 1842, and went into business with his father when he was twenty-one, which was not till 1863; from which we may infer that he was only fifteen years old in 1857, and that all his brothers and sisters, except Julia, and perhaps another, were older than himself. About 1857 the old gentleman, Samuel Marshall, seems to have had a secret recipe for a mixture or compound constituting a certain liniment, which he claimed would cure rheumatism and various other diseases, and which he occasionally made up and gave to such persons as were willing to try it. There is no evidence that he was the inventor or originator of the recipe, and the inference is that he was not. For a time, while in the employ of others, he sold it as he had opportunity, without any label, but only a slip of paper attached with the word "Liniment" written upon it. Soon after, he commenced peddling it in a small basket; and on his second trip John W. went out with him, and subsequently alone. Also his sons-in-law, Warren, Harris and Robinson, and his son Samuel A., made and sold quantities of it, with his knowledge and consent. It appears, from some of the witnesses, that his first label was 'Marshall's Liniment; put up by Marshall & Son, 14, 15, and 16 Oak street,' Fond du Lac.

"It seems that plaintiff *Charles H.*, before he became of age, worked with the others in putting up and peddling out this liniment. In 1863, and on *Charles H.* becoming twenty-one years of age, he went into the business with or under his father, in what he terms the 'partnership' between his father, his brother John W., and himself, which lasted, according to his statement, until the latter part of 1868, or the forepart of 1869, when it was dissolved or broken up. It is a little difficult to understand just what *Charles H.* meant by 'partnership.' He testifies: 'We were interested in the labels, and we bought stuff together; that was as far as the partnership

extended.  Each one made and labeled and sold what he could, and pocketed the proceeds; but when we ordered a lot of labels, they were paid for together, and lots of other stock we bought together — we bought it together and divided.  We all had an equal right to manufacture, sell and label it — my father and my brother and me.'  He further testified that about the time they dissolved, in 1868–9, 'we began to have some orders, and he (father) had the letter-box and took the orders and filled them, and that was the end of the partnership; he.didn't give any share of the profits to us two.  After we dissolved, for a little while, I was speculating around, at nothing in particular; that was only for a short time, from three to six months.  Then I went back into the patent-medicine business with my wife; that is, I didn't go into it myself, but I went to selling it.  After the dissolution, I think John W. sold for the old gentleman a little while, and then he moved away — left the country.'

" Each of the children seems to have known the secret — the recipe or formula for making the liniment; but the labels seem to have been obtained mostly from the old gentleman, who permitted each and all the children to make the liniment and sell the same from house to house.  *Charles H.* testified that the old gentleman barred him out, and would not let anybody use his labels, after he stopped the partnership, because he wouldn't let anybody have any of the orders that came in, and that dissolved the firm.  It appears from other testimony that each peddled and sold the liniment on different routes; that they ran into each other's custom, and took customers the one from the other, and then there arose a dispute and controversy between them; and that John W. and *Charles H.* then undertook to form a partnership with their father and mother, putting all their father's and mother's property into the firm, but that the mother refused to execute the paper and it fell through, and then they finally divided between themselves certain routes, each reserving customers not on their own

regular routes, and subsequently traded some of their cus-
tomers and exchanged a corresponding number of their
labels; that the label used had been changed by the old gentle-
man to 'Old Dr. S. Marshall's Celebrated Liniment,' with
certain other words descriptive of the liniment, and a certain
vignette of a horse's head; that, long prior to the making of
his will, hereinafter mentioned, he gave to each of his children,
and especially Mrs. Sarah G. Benson and Haidee Ann Robin-
son, under whom the defendant claims to act, the secret recipe
or formula for making the liniment, and the right to manu-
facture and sell the same, with said label or labels upon it as a
trade-mark, and that they had severally, with his knowledge
and consent, from time to time made such sales with such
labels or trade-marks thereon, and their own address at the
bottom; but *Charles H.* testified that such change in the label
was made shortly after such dissolution, and that the horse's
head was never used while they were in partnership, and that
he never used the horse's-head label himself; that he used the
label 'Marshall's Rheumatic Liniment' about two or three
years before his father's death, but did not use the label 'Old
Dr. S. Marshall's Celebrated Liniment' before his death.    It
also appears that Samuel Marshall died July 6, 1870; and that
his widow, Mary J. Marshall, continued to manufacture said lini-
ment and cause the same, with said label affixed, to be sold
upon the routes last occupied by her husband, until the spring
of 1872, when *Charles H.* bought out the material and para-
phernalia belonging to his mother's business, and gave therefor
his note for $400.

    "About 1877 the mother, Mary J. Marshall, died; and sub-
sequently it was ascertained that her husband, Samuel Mar-
shall, had, some time during the last two years of his life,
executed a last will and testament, but which had been lost,
and which was established as a lost will and admitted to pro-
bate, February 26, 1880, and in and by which he gave to his
wife, in general terms, all his property, but named no executor

Marshall and another vs. Pinkham.

or executrix, and there is nothing to show that his estate was ever settled, or that any administrator of his estate was ever appointed. It also appears that from 1869 to the time of suit the plaintiffs manufactured and sold such liniment, with a label affixed describing it as 'Marshall's Rheumatic Liniment,' and other descriptive words, and closing with, 'All orders directed to M. W. Marshall, P. O. box 70, Fond du Lac, Wisconsin,' being Exhibit A. This suit is to restrain the defendant, claiming under a right or license from Mrs. Benson and Mrs. Robinson, from manufacturing said liniment, and selling the same, with a label affixed describing it as 'Old Dr. S. Marshall's Celebrated Liniment,' and with other descriptive words, and a certain vignette of a horse's head, and closing with 'Sterling Medicine Co., Proprietors, Fond du Lac, Wisconsin,' being Exhibit G.

"Upon the trial the court found, in effect, that the plaintiffs had no exclusive right to the use of the label or trade-mark, and that the defendant was entitled to judgment dismissing the complaint."

From the judgment entered in accordance with such finding, the plaintiffs appealed.

For the appellants there was a brief by *Shepard & Shepard*, and oral argument by *T. W. Shepard* and *S. U. Pinney*.

*Geo. E. Sutherland*, for the respondent.

CASSODAY, J. A trade-mark performs a distinctive office. As such its use may be protected by the courts. But this does not authorize a monopoly upon fragments of the language, nor the exclusive appropriation of words in common use descriptive of common objects and qualities. It has often been decided that words which are merely descriptive of the kind, nature, style, character or quality of the goods or articles sold, cannot be exclusively appropriated and protected as a trade-mark.

In *Caswell v. Davis*, 58 N. Y., 223, it was held that "words

or phrases in common use, and which indicate the character, kind, quality and composition of an article of manufacture, cannot be appropriated by the manufacturer exclusively to his own use as a trade-mark." Accordingly, where the plaintiffs prepared a medicine, the principal ingredients of which were iron, phosphorus and elixir of calisaya bark, to which they gave the name of "Ferro-Phosphorated Elixir of Calisaya Bark," and so labeled the bottles containing it, the court " held that this phrase could not be protected as a trade-mark." For the same reason it was held in *Taylor v. Gillies*, 59 N. Y., 331, that as the words "gold medal" indicated quality, and that in some competitive exhibition a gold medal had been awarded to the article for its excellence, the use of them could not be appropriated as a trade-mark. So it was held that "Lackawanna coal" was descriptive, and could not be appropriated as a·trade-mark. *Canal Co. v. Clark*, 13 Wall., 311. See also *Perry v. Truefitt*, 6 Beavan, 66; *Corwin v. Daly*, 7 Bosworth, 222; *Williams v. Johnson*, 2 Bosworth, 1; *Amoskeag Manuf'g Co. v. Spear*, 2 Sandf. (S. C.), 599; *Fetridge v. Wells*, 13 How. Pr., 387–8; *Partridge v. Menck*, 2 Barb. Ch., 101; *Popham v. Cole*, 66 N. Y., 69. From these authorities it is evident that the words "Rheumatic Liniment," "Celebrated Liniment," and the other words in the label in question, descriptive of the liniment sold, could not be appropriated as a trade-mark.

It seems to be the office of a trade-mark to point out the true source, origin or ownership of the goods to which the mark is applied, or to point out and designate a dealer's place of business, distinguishing it from the business locality of other dealers. Such is substantially the rule laid down by many authorities. *Dunbar v. Glenn*, 42 Wis., 118; *Gillott v. Esterbrook*, 48 N. Y., 374; *Amoskeag Manuf'g Co. v. Spear*, 2 Sandf. (S. C.), 599; *Fetridge v. Wells*, 13 How. Pr., 385; *Barrows v. Knight*, 6 R. I., 434; *Tilley v. Fassett*, 44 Mo., 168; *Boardman v. Meriden Britannia Co.*, 35 Conn., 402.

There are many cases holding this doctrine, but these, and those above cited on the question of description, sufficiently indicate the rule.   The words " Marshall's Liniment," " Marshall's Rheumatic Liniment," "Marshall's Celebrated Liniment," " Old Dr. S. Marshall's Celebrated Liniment," used in the various labels before us, could only, therefore, be protected as trade-marks in so far as they pointed out Marshall or old Dr. S. Marshall as the true originator or owner of the liniment to which they were attached.   Of course, the address at the bottom of each label, by whomsoëver used, indicated where and of whom the liniment could be obtained; and as it was sold almost wholly by being peddled out, no special mark or symbol was necessary or used to designate the dealer's place of business, distinguishing it from the business locality of other dealers, unless it was the vignette of the horse's head, which the plaintiffs never used and to which they make no claim.   If the plaintiffs' label is entitled to the relief prayed for, it must be on the theory that they are entitled to the exclusive use of not only the word "Marshall's," but the words " Old Dr. Marshall's," as continuing to point out the true source, origin or ownership of the mixture, compound or liniment to which it was first applied by the father.   True, old Samuel Marshall had a recipe of the mixture as early as 1857, but there is no pretense that he was the inventor, discoverer or originator of it.   As stated, the father disclosed the secret to all his children, and each of them put it up, affixed the label in use, and sold or caused it to be sold for his or her own benefit, during the father's lifetime, with his knowledge and in accordance with his often-expressed wish.   Upon his death it would seem that such sales were continued by the widow and some of the children as before.

Can this court say, upon the facts of this case, that *Charles H.* had, prior to his father's death, by adoption and use acquired the exclusive right to the use of the word " Marshall's," or the words, " Old Dr. S. Marshall's," as a trade-mark upon the

mixture so put up and sold by him, or by him and his wife? It must be remembered that the theory upon which actions for the infringement of a trade-mark are maintained, is that the law will not allow one person to sell his own goods as and for the goods of another. It is to prevent fraud and imposition upon the public, as well as the invasion of private rights. In *Singleton v. Bolton*, 3 Douglass, 293, the plaintiff's father sold a medicine called "Dr. Johnson's Yellow Ointment." After his death, his son, the plaintiff, continued to sell the same medicine, marked the same way. The defendant also sold the same medicine, with the same mark upon it, and so the plaintiff brought the action for infringement, but was non-suited. A rule for a new trial was discharged by Lord MANS-FIELD, who said: "If the defendant had sold a medicine of his own under the plaintiff's name or mark, that would be a fraud for which an action would lie. But here both the plaintiff and defendant used the name of the original inventor, and no evidence was given of the defendant having sold it as if prepared by the plaintiff. The only other ground on which the action could be maintained, was that of property in the plaintiff, which was not pretended, there being no patent, nor any letters of administration."

In *Canham v. Jones*, 2 Vesey & Beames, 218, it appears that one Swainson was for thirty years the sole proprietor of the secret or recipe for preparing the medicine called "Velno's Vegetable Syrup," which he had purchased for £6,000, and by his will bequeathed the same to the plaintiff, who, after the testator's death, continued to make and sell the same preparation as specified by the recipe. The defendant had been employed in preparing the syrup for Swainson, but never knew the complete composition, as Swainson always added other essential engredients; but after his death the defendant made at his residence and sold a medicine under the name of "Velno's Vegetable Syrup," and represented that it was precisely the same as that made and sold by the late Mr. Swainson. On de-

murrer it was held that the bill could not be maintained. PLUMER, V. C., said: "The bill proceeds upon an erroneous notion of exclusive property now subsisting in this medicine, which Swainson, having purchased, had a right to dispose of by his will, and, as it is contended, to give the plaintiff the exclusive right of sale. If this claim of monopoly can be maintained, without any limitation of time, it is a much better right than that of a patent." The court then goes on to state that the case did not come within the class of cases "in which the court had restrained a fraudulent attempt by one man to invade another's property," nor where one appropriates to himself the benefit of another's good-will, nor of one person falsely representing himself to be another, or his trade or production to be the same as another, thus combining imposition on the public with injury to the individual. The vice-chancellor, in closing, said: "The defendant does not hold himself out as the representative of Swainson, setting up a right in that character to the medicine purchased by him, but merely represents that he sells, not the plaintiff's medicine, but one of as good a quality. He is perfectly at liberty to do so. If any exclusive right in this medicine ever existed, it has long expired."

In *The Leather Cloth Co. v. The American Leather Cloth Co.*, 11 Jurist, N. S., 513, Lord CRANWORTH, among other things, said: "Difficulties, however, may arise where the trademark consists merely of the name of the manufacturer. When he dies, those who succeed him (grandchildren, or married daughters, for instance), though they may not bear the same name, yet ordinarily continue to use the original name as a trade-mark; and they would be protected against any infringement of the exclusive right to that mark. They would be so protected, because, according to the ways of the trade, they would be understood as meaning no more by the use of their grandfather's or father's name, than that they were carrying on the manufacture formerly carried on by him. Nor would

the case be necessarily different, if, instead of passing into other hands by devolution of law, the manufactory were sold and assigned to a purchaser.    The question in every such case must be, whether the purchaser, in continuing the use of the original trade-mark, would, according to the ordinary usages of trade, be understood as saying more than that he was carrying on the same business as had been formerly carried on by the person whose name constituted the trade-mark."    Page 516.

The case before us differs from most cases in the fact that the name of the father had, for many years during his life, been attached to this mixture or liniment, whether put up and peddled out by his children or himself, and that it was the reputation of the liniment acquired by such peddling, instead of a particular place of trade, which gave it whatever value it had.    Upon the authorities cited it would seem to be very certain that *Charles H.* never acquired an exclusive right to the use of the word " Marshall's " or " Old Dr. S. Marshall's," upon the liniment put up by him, as against his father, mother, brothers or sisters.    If the plaintiff *Charles H.* never acquired any such exclusive right as against them, it would seem quite doubtful whether he ever acquired it as against any one.    By such diffusive use it may be that the word " Marshall's " had ceased to perform the office of a trade-mark, as above defined, if it ever in fact had that office.    A trade-mark is to prevent fraud and imposition, not to inaugurate and perpetuate them. If old Samuel Marshall, surreptitiously or by favor of another, obtained the secret or receipe, and made up the mixture and sold it as " Marshall's Liniment," thus representing that he was the inventor or originator of the mixture when in fact it was discovered by another, it would seem to have been an imposition upon the public in its inception.    Should such imposition be regarded as condoned by Samuel Marshall's long-continued use, and by his establishing for it a good reputation on account of its virtues and healing properties, yet it may be doubtful whether it would, as against the public, survive the

appropriation and use by each member of his numerous family, and be protected as the trade-mark of each, a decade after his death. The question occurs, Whom does the word " Marshall's " point out as the true source, origin or owner of the original genuine mixture, or what particular place of business or sale has it designated during these many years? If it never in fact truly so pointed out or designated, or if by its distributive use, or by the change from "Marshall's" to "Old Dr. S. Marshall's," it ceased to perform that function, then it can no longer be protected as a trade-mark.

In *Burgess v. Burgess*, 17 Eng. L. & E., 257, John Burgess, the father of the plaintiff, had for some years manufactured and sold, at No. 107 Strand, "a fish sauce," under the name of " Burgess's Essence of Anchovies." Then he took the plaintiff, his son William R., into partnership, and continued the business under the firm name of "John Burgess & Son," selling the same article under the same name. John died, and the plaintiff, William R., continued the business at the same place, in the name of the old firm, selling the same article under the same name, and employed the defendant, his son William H., on a salary in the business. Subsequently a difficulty arose between father and son, and the latter left the service of the former, and went into business for himself at another place, and commenced selling the same kind of fish sauce under the same name of " Burgess's Essence of Anchovies," at what he advertised as ' Burgess's Fish Sauce Warehouse, *late of* 107 *Strand*," but at a lower price; and the bill charged that the sales were made as and for the article manufactured and sold by the plaintiff, and to deceive and defraud the plaintiff and the public. The vice-chancellor granted the injunction stopping the defendant, in so far as his advertisement indicated that he was the same man, and conducting the same business, as "late of 107 Strand," but refused to restrain him from manufacturing and selling "fish sauce" under the name of "Burgess's Essence of Anchovies;" and the appeal there-

from was dismissed. In giving the opinion of the court, KNIGHT BRUCE, L. J., said: "All the queen's subjects have a right, if they will, to manufacture and sell pickles and sauces, and not the less that their fathers have done so before them. All the queen's subjects have a right to sell them in their own name, and not the less so that they bear the same name as their father; and nothing else has been done in that which is the question before us. . . . He (the defendant) carries on business under his own name, and sells essence of anchovy as 'Burgess's Essence of Anchovy,' which it is. . . . The only ground of complaint is the great celebrity which, during many years, has been possessed by the elder Mr. Burgess's essence of anchovy. That does not give him such exclusive right, such a monopoly, such a privilege, as to prevent any man from making essence of anchovy, and selling it under his own name." *S. C.*, 17 Jurist, 292.

In *James v. James*, L. R., 13 Eq. Cas., 421, it was held, per Lord ROMILLY, M. R., that "any person who has, without the use of unfair means, become acquainted with the mode of compounding a secret, unpatented preparation, may, after the death of the original discoverer, make and sell the compound, describing it by the name of the discoverer, provided he does not lead the public to suppose that his preparation is the manufacture of the successors in business of the original discoverer; but he must not assert that his is the only genuine article, or suggest that the article manufactured by the successors of the original discoverer is spurious." *S. C.*, 2 Eng., 365.

In *Massam v. Thorley's C. F. Co.*, 6 Ch. Div., 574, it was held, per MALINS, V. C., that "any person who has become acquainted with the process of manufacturing an article which is in general secret, is entitled to manufacture it; and if the name of the first manufacturer has become attached to the article, any person afterwards manufacturing is entitled to describe it by the name of such original manufacturer; and if he happens to be of the same name as the original manufac-

turer, he may use his name in describing his business, or allow it to be used by a company formed by him for the purpose of carrying on the business, notwithstanding that the representatives of the original manufacturer continue to carry on the old manufacture under the old name." *S. C.*, 23 Eng., 175.

In *Meneely v. Meneely*, 62 N. Y., 427, it was held that "a person cannot make a trade-mark of his own name, and thus debar others having the same name from using it in their business. Every man has the absolute right to use his own name in his own business, even though he may thereby interfere with and injure the business of another bearing the same name, provided he does not resort to any artifice or do any act calculated to mislead the public as to the identity of the establishments, and to produce injury to the other beyond that which results from the similarity of the names." To the same effect are *Gilman v. Hunnewell*, 122 Mass., 139; *Carmichel v. Latimer*, 11 R. I., 395.

In *Lea v. Deakin*, 18 A. L. R., 322, Judge DRUMMOND refused to restrain the application of the word "Worcestershire" to sauce, on the ground that the name had become generic, and that persons residing at a place of that name in England, and who there manufactured the sauce and sold it by that name, did not thereby acquire the exclusive use of the same as a trade-mark.

In *Cheavin v. Walker*, 5 Ch. Div., 850 (*S. C.*, 22 Eng., 513), S. Cheavin and his son, G. Cheavin, manufactured and sold filters, which had been patented by the father, S. C., under the title and marked with the label as "S. Cheavin's Improved Patent Gold Medal Self-Cleaning Rapid Water Filters." After the father died, and the patent having expired, G. C. substituted his name in the place of his father's, and continued the manufacture and sale under the same name so modified, above which was a medallion containing the royal arms, surmounted by the words "By Her Majesty's Royal Letters Patent." The defendant left the employ of G. C., and began manufacturing

and selling in the same town for himself filters similar in appearance to G. C.'s, and inscribed with "S. C.'s Patent Prize Medal Self-Cleaning Rapid Water Filters; Improved and Manufactured by Walker, Brightman & Co.;" and it was held by the court of appeal, reversing the vice-chancellor's decision — "*First*, that the label used by the plaintiff was not a trademark, but only a description of the article as made according to S. C.'s patent, which was common to all the public; *secondly*, that there was nothing in the defendant's label calculated to mislead the public by a fraudulent imitation of the plaintiff's label; *thirdly*, that the plaintiff's label, coupled with the medallion of the royal arms, constituted a false representation that the patent was still subsisting, and disentitled the plaintiff to relief by injunction."

In *Singer Manuf'g Co. v. Wilson*, 2 Ch. Div., 434 (*S. C.*, 16 Eng., 827), it was held, in effect, on appeal, affirming the decree of the master of the rolls dismissing the bill, that "when a manufacturer, A. (Singer), has acquired a reputation in the market, so that the goods made by him are commonly known by his name, but is not possessed of any patent, a rival manufacturer, B. (Wilson), being entitled to imitate A's goods, is entitled also, provided that he does not place A's name on his own goods, to advertise his goods and offer them for sale by the name of A. (Singer), if he takes care to state clearly at the same time that the goods which he sells are manufactured by himself." That case was subsequently reversed in the House of Lords, but without prejudice to any question in the case, in the event of further evidence being given, which was thereby authorized. 3 Appeal Cases, 376; *S. C.*, 24 Eng., 272. The syllabus of the case may seem to be in conflict with some of the cases cited, but it was really reversed on account of the irregularity of the proceedings, and because it was not essential for the plaintiffs to prove actual intent to deceive purchasers to make out a *prima facie* case; but that if the defendant's advertisements were calculated to

mislead an unwary purchaser of the machines into the belief that he was purchasing those manufactured and sold by the plaintiffs, then they were *prima facie* entitled to an injunction; and all other questions were expressly reserved by the lord chancellor until further evidence should be adduced.

Applying the rules governing the authorities cited, to the case at bar, we are forced to conclude that any citizen had a perfect right to manufacture and sell the mixture or liniment formerly manufactured and sold by old Samuel Marshall. It is equally clear that any of the Marshall children, or any other person by the name of Marshall, having acquired a knowledge of the compound, had a perfect right to manufacture and sell it, by himself or others, in his own name, even against the protest of old Samuel Marshall, provided he did not do it in such way as to be likely to mislead ordinary purchasers, proceeding with ordinary caution, into the belief that they were purchasing the liniment manufactured and sold by old Samuel Marshall himself. If this could be rightfully done, contrary to his wish and against his protest, it most certainly could be done by his children, as it was, with his expressed approbation. If such right to manufacture and sell existed as against old Samuel Marshall himself, then it most certainly did as against any one of his children. If none of his children could, in the case supposed, be restrained by the father during his life, it is equally certain that they could not be restrained by another, or even his representative, after his death. It would also seem to follow, from the cases cited, that on the death of old Samuel Marshall (assuming that no one succeeded to the good-will of his business), any citizen would have the legal right to manufacture liniment composed of the same ingredients and made in the same way as he manufactured that sold by him, and also, in making sales, to describe it as such. Upon that assumption the words " Old Dr. S. Marshall's Celebrated Liniment " were merely descriptive of the compound, and, if truthfully applied by the defendant in making sales, no one could rightfully complain,

as no one had any patent upon it or exclusive right to the use of any words which aptly described it. Upon his death, with no successor to the good-will of his business, those words would cease to indicate origin or ownership, and hence cease to be a trade-mark.

There is no pretense that old Samuel Marshall ever, in the manufacture and sale of this liniment, perpetrated any actual or constructive fraud or deceit upon the business of *Charles H.*, but on the contrary Exhibit B, which *Charles H.* testified that he never used, and which it appears that the father, and other children under his authority, did use, closes with these words: " N. B. Dr. Marshall will hold himself responsible for the genuineness of no preparation which does not bear his own trade-mark of the horse's head." From this it would naturally be inferred that, in the opinion of the father, *Charles II.* was not selling the genuine mixture; but the fact that *Charles H.* knew the formula or recipe would seem to indicate that he did sell the same compound. That postscript or notice does not seem to have been used by the defendant or any of the children after the death of the father. There is nothing in the finding, and there seems to be no evidence, which would warrant us in holding that the defendant did anything in advertising or selling his mixture to lead the public to suppose that he was the successor of old Samuel Marshall, or that his was the only genuine article, or that the plaintiffs' mixture was spurious, or that he was selling the same as and for the liniment manufactured by the plaintiffs; and without some of these things being done there would seem to be no ground for an injunction, within the doctrine of the above authorities.

Again, the long delay of *Charles II.* to assert an exclusive right to use the words " Old Dr. S. Marshall's Celebrated Liniment," would of itself, on a proper showing, seem to be an impediment to his protection in the exclusive use of them. *Beard v. Turner*, 13 L. T. R., 746; *Flavell v. Harrison*, 19 Eng. L. & Eq., 15; *Lea v. Deakin*, 18 A. L. R., 322.

There is still another view of this case deserving notice. There is no claim that old Samuel Marshall, much less *Charles H.*, actually discovered or invented the mixture or compound. There is no pretense that either had the exclusive right, during the life of the father, to manufacture and sell it under the name of "Marshall's Rheumatic Liniment," or "Old Dr. S. Marshall's Celebrated Liniment." These facts being admitted, it would seem to be at least extremely doubtful whether *Charles H.* ever acquired the exclusive right to their use as a trade-mark; and if such exclusive right was doubtful, it would seem to be contrary to the practice in equity to grant an injunction in the first instance.

In *Farina v. Silverlock*, 6 De Gex, M. & G., 214, it was held, by Lord Chancellor CRANWORTH, that, "in a case where the mark consisted of a label in a certain form, and it was shown that in very many instances labels the same as or similar to it might be sold for a legitimate purpose, the court, in the absence of any proof of actual fraud, refused to restrain the printing and sale of such labels until the manufacturer, who alleged that they were used for a fraudulent purpose, had established his case by an action at law."

In *Spottiswoode v. Clark*, 10 Jurist, 1043, it was held by the Lord Chancellor, on a bill to restrain the defendant from selling a mark alleged to be a fraudulent imitation of the plaintiff's, "that, it not being perfectly clear that the plaintiff had a legal right, the injunction prayed by the bill ought not to be granted." This is especially the rule where the plaintiff is himself seeking to deceive the public. *Pidding v. How,* 8 Simons, 477; *Motley v. Downman*, 3 Mylne & Craig, 1; *Clark v. Freeman*, 11 Beavan, 112; *Flavell v. Harrison*, 19 Eng. L. & Eq., 15; *Perry v. Truefitt*, 6 Beavan, 66. Mr. Browne tersely states the true rule when he says: "The right to the use of the mark must be *exclusive* of all other persons. A trade-mark is an emblem of a man just as much as his written signature, and is used to denote that an article of mer-

chandise has been made by a certain person, or that it has been sold or offered for sale by him. If the same mark were to be used by different persons for the same species of goods, it would lead to inextricable confusion; and its true and only legitimate purpose would be overturned, for then it would lack the essential element of an indication of origin or ownership." Section 303. From this it would seem that *Charles H.* never had in himself any such exclusive right in the words in question as would authorize a court of equity to restrain others from using the same *bona fide* in the sale of their own goods, and without any tendency to deceive. The only remaining question is, whether the wife of *Charles H.* got such exclusive right by way of the alleged purchase from the mother, and the discovery after her death of the existence of a lost will left by the father, and the establishment of it as such, and the admitting of it to probate. As suggested on the argument, neither the mother, Mary J., nor the plaintiff *Mary W.*, could get any title to the personal property, business, and good-will of the business of old Samuel Marshall, except through an administration upon his estate, and an order of distribution; and as no order of distribution was ever made, nor administrator or administratrix was ever appointed, it follows that the plaintiff *Mary W.* got nothing through the alleged purchase. *Murphy v. Hanrahan*, 50 Wis., 485. To the same effect is *Singleton v. Bolton, supra*. As no exclusive right of either of the plaintiffs was invaded, they were not entitled to an injunction by reason of any mere absence of such right on the part of the defendant.

*By the Court.*—The judgment of the circuit court is affirmed.