BRENNAN et al. v. EMERY–BIRD–THAYER DRY–GOODS CO.

(Circuit Court, W. D. Missouri, W. D. February 26, 1900.)

1. CORPORATIONS—NOTICE TO OFFICER OR AGENT.

Notice given, before the organization of a corporation, to a person who afterwards became a stockholder and officer or an agent of the corporation, is not notice to the corporation.

2. TRADE-MARKS—NOTICE—EFFECT OF REGISTRATION.

The registration of a trade-mark in the patent office does not affect those not engaged in commerce with foreign nations or Indian tribes with notice thereof.

3. SAME—INFRINGEMENT—SUIT FOR INJUNCTION.

Defendant, a mercantile corporation, caused to be placed on shoes manufactured for its trade certain words and a symbol, which together were claimed by complainants as a trade-mark. As used by complainant, there was nothing about the device to indicate the manufacturer of the shoes, or that it was a trade-mark, and defendant's officers were not aware that it was so used. As soon as they learned the fact they ceased to have it stamped on their shoes, and at the time suit for infringement was instituted they had on hand but about two dozen pairs of shoes bearing it, and at about that time caused it to be erased from them. *Held* that, under such circumstances, the court would not entertain a suit for an injunction against infringement, it being clear that there had been no intentional violation of complainant's rights, and that none was threatened.

4. SAME—DESCRIPTIVE WORDS.

A trade-mark, used on shoes, and consisting of the words "Steel Shod" in connection with a symbol, is not infringed by the words "Steel Clad" alone, stamped on shoes having the soles quilted with steel wires; such words being descriptive merely, and not subject to appropriation as a trade-mark.

Suit in Equity for Infringement of a Trade-Mark.

Robert Bach McMaster and Clarence Palmer, for complainants.
John L. Peak, for defendant.

PHILIPS, District Judge. This is a bill of complaint to enjoin the defendant from the use of the complainants' alleged trade-mark, and for an accounting. The words claimed as a trade-mark symbol are "Steel Shod," used in connection with the representation of an anvil, stamped on the shank of shoes manufactured by the complainants since 1891. In considering this case, regard must be had to the fact that the whole allegations of the bill in respect of the alleged infringement are lodged against the Emery-Bird-Thayer Dry-Goods Company, a corporation created under the laws of the state of Missouri. It is, therefore, its acts and conduct which are the subjects of inquiry and determination. The evidence shows that this corporation was organized in November, 1895. The complainants have taken evidence and based much of their argument touching things done by the co-partnership firm of Bullene, Moore, Emery & Co., which existed for several years prior to January, 1895, and the co-partnership firm of Emery, Bird, Thayer & Co., which came into existence perhaps in January, 1895, as the successors of Bullene, Moore, Emery & Co. This last concern went out of existence on the creation of said corporation. As the corporation is a distinct legal entity, in the absence of any averment in the bill and evidence showing a devolution of the

right upon or assumption by the corporation of the liabilities and obligations of said co-partnership concerns, any act done or liability incurred by such concerns could not bind or affect this defendant. Neither does the bill or proof show any such assumption or liability by this defendant.

It appears that one Robinson had been in the employ of said co-partnership firms as their agent, in charge of their shoe department, in a department store, and that he attended to making all the purchases of shoes for them, and that he had sustained the same relation to the corporation since its organization. The evidence also shows that not all of the persons who composed said co-partnerships are directors or stockholders in the defendant corporation. I do not understand the law to be that any information or knowledge which said Robinson may have acquired in his capacity as agent for said co-partnerships is imputable to the defendant corporation. The foundation of the doctrine that knowledge of the agent is chargeable to the principal rests upon the proposition that such knowledge comes to him while acting within the line of his agency for the given principal; and, as it is his duty to advise his principal of facts and information pertaining to his office as agent, the law presumes that he performs this duty, and therefore the further presumption arises that his principal obtains such information. Story, Ag. par. 140; Bank v. Lovitt, 114 Mo. 525, 21 S. W. 825. With the dissolution of the co-partnership, the office of Robinson as its agent ceased. When the corporation was created this legal entity became a distinct existence. Any knowledge or notice which an agent may have received while acting for another party or association, or which any individual member of the corporation may have obtained prior to the constitution of the corporate body, most certainly would not, as matter of law, by implication, be carried over and imputed to the corporation, simply because one or more of the members of a previously existing concern may have become officers or stockholders of the corporation, nor because such agent afterwards became an agent for the corporation. Were the law otherwise, most serious and unjust consequences might be brought upon the corporate body. "The notice must be given to the agent while the agency exists, and it must refer to business which comes within the scope of his authority." Anderson v. Volmer, 83 Mo. 406. See, also, National Waterworks Co. v. City of Kansas City (C. C.) 78 Fed. 434, 435.

In this view of the law, what are the facts to be dealt with in this case? The last sale of shoes by complainants was to Bullene, Moore, Emery & Co. in June, 1892, more than three years before the defendant came into being; and, in so far as the evidence discloses, it does not appear that, when the defendant had the shoes in question made, after November, 1895, and up to December, 1896, it knew that the complainants were manufacturing and stamping such shoes. It had no notice that the complainants were using or claiming their alleged trade-mark. On the contrary, the testimony on behalf of the defendant shows affirmatively that its agent in charge of the shoe department, when knowledge came to him in 1891 and 1892, assumed and believed that the stamp in question

on the bottom of complainant's shoe was not used or claimed as a trade-mark, but was merely descriptive of the quality and character of the shoe. No constructive notice to the defendant is predicable of the fact that complainants had registered such symbol or device as a trade-mark in the patent office. The act of congress of July 8, 1870, providing for the registration of trade-marks, "is void for want of constitutional authority, inasmuch as it was so framed that its provisions are applicable to all commerce, and cannot be confined to that which is subject to the control of congress." Trade-Mark Cases, 100 U. S. 82, 25 L. Ed. 550. And the act of March 3, 1881, applies only to "trade-marks used in commerce with foreign nations, and with the Indian tribes."

The shoe marked "Complainants' Exhibit March 28, 1898," as the one manufactured by them after the defendant began business, is unlike the shoe bought and sold by the defendant. Complainants' shoe had a plain black sole unquilted, while the defendant's had a steel-quilted sole of wires; and while it is true that the brand on the sole of defendant's shoe, with the words "Steel Shod" above the anvil, stamped on the shank, is practically the same as that of the complainants, the defendant had stamped beneath the anvil in large, letters the initials of the defendant company, "E., B. T. & Co.," indicating that it was defendant's manufacture. There was nothing about the symbol on complainants' shoe to indicate that it was used as a trade-mark, or to indicate ownership or the manufacturer of the shoe. Not until December, 1896, did the agent, Robinson, learn that the complainants claimed the words "Steel Shod" as a trade-mark. Even this information did not come from complainants, but from Rice & Hutchings, of Boston, who manufactured shoes for the defendant. Immediately on receipt of such information, Robinson wrote to Rice & Hutchings to the effect that he was not aware that the complainants claimed such words as a trade-mark, and to discontinue the use thereof in the manufacture of shoes for the defendant. Thenceforth the defendant had not another shoe made with such stamp or symbol.

It is quite clear, from defendant's evidence, that there was never any purpose on its part to infringe upon the complainants' alleged trade-mark, or to palm off its goods as those of complainants' make. This suit was filed in March, 1897, without any previous complaint or notice from complainants to defendant that they made claim to a trade-mark; and the testimony of Mr. Robinson, the agent, and that of Mr. Thayer, defendant's secretary and treasurer, the only parties representing the defendant who had anything to do with this matter, is that their best impression is that at the time the house only had on hand a dozen or two of the shoes manufactured for them by Rice & Hutchings; and their best recollection is that before this suit was filed the house had erased entirely from said shoes said words and the impression of an anvil, which erasure is shown by an exhibit in this case. Certainly it should be the equity of the case that under such circumstances, indicating entire absence of any purpose on defendant's part to interfere with complainants' claimed prescriptive right, that any reasonable doubt as to the

exact time when this erasing was done should be resolved in the defendant's favor. But suppose it were conceded that this erasure of the alleged trade-mark on the few shoes in stock was near to or at the time this suit was filed; should the court, under the circumstances of this case, decree an injunction? Should the valuable time of this court, pressed, as it is, with multitudinous causes of importance, pressing for hearing and judgment, be taken up with practically a moot question, which, as far as the court is able to perceive, can have no other object than to enable the complainants to get an adjudication for future use? While it is to be conceded that a party having an established trade-mark may sue for its infringement without first notifying the infringer to desist, yet, when it is made clear that before any suit was brought the alleged infringer, on the first intimation of the infraction, discontinued the use, and did everything that could be reasonably required to remove even the appearance of the use, and both by answer to the bill and at the hearing its counsel proclaimed that, waiving any question as to whether or not the complainants have a trade-mark, the defendant had ceased, before or at the time of the institution of the suit, to use the same, that they had no purpose to continue the employment of the symbol,—and the court is well satisfied that such disclaimer was and is in good faith, and will be scrupulously adhered to,—shall the court, nevertheless, grant an injunction, and put upon such defendant the costs? For myself, I am unwilling to encourage such unnecessary litigation, and think that, in the interest of the public and of waiting bona fide litigants, the court ought to discountenance such lawsuits. As said in Bass, Ratcliff & Gretton v. Guggenheimer (C. C.) 69 Fed. 271:

"It is a sound rule for the prevention of unnecessary litigation, and to encourage parties who have ignorantly and without bad faith infringed a trade-mark to promptly desist, without suit, upon being notified, that where a complainant had already obtained, before entering suit, by prompt acquiescence of the defendant, all that an injunction could give him, he should not recover costs."

If it be said that, notwithstanding, the case should be retained by the court in order to ascertain and assess damages, the answer is that it is perfectly clear from the complainants' evidence in this case that no conceivable, tangible loss has ensued by reason of any act of the defendant. The evidence shows that the complainants sold all the shoes which they made up to the capacity of their factory in 1896 and 1897. "In 1897 we had the full benefit of our increased capacity, and then we did a good deal more, $232,000," which was a decided increase over 1895. The falling off in 1896 was, as the witness concedes, solely attributable to the delays occasioned in the improvement of the factory. During the period run that year, their books show a decided increase over the preceding year. It is only made to appear from the evidence that one man called at defendant's store for a "steel-shod" shoe; and the books of the complainants, in evidence, show that beginning with 1893, and up to June 6, 1896, the sales of the complainants to other merchants in Kansas City were in no wise affected by the fact that Bullene,

Moore & Emery ceased to buy from the complainants after June, 1892. Their books show that in the year 1891 they sold to Bullene, Moore & Emery $79.50 worth of goods; in 1892, to Bullene, Moore & Emery, $436.50, and to the Doggett Dry-Goods Company $112.50, aggregating $549; in 1893 they sold to other merchants in Kansas City $661.40 worth; in 1894, $1,013.85; in 1895, $555.75; and up to June, 1896 (the year in which their factory was not run all the time), their sales amounted to $538.45. The case thus presented is damnum absque injuria.

Impressed, as the complainants must have been, in view of the foregoing facts, with the slender thread upon which they were suspending a lawsuit, they now contend that, since the defendant abandoned the use of their exact symbol, it resorted to a device so similar to theirs as to constitute a continuation of the alleged infringement. It should be a sufficient answer to this suggestion to say that no such issue is presented by the bill. The thing complained of solely in the bill is the use of the alleged trade-mark of the complainants,—the same, or substantially the same, as complainants', with the words, "as by reference to defendant's said shoes here in court to be produced will more fully appear." The shoes thus referred to, and the only shoes put in evidence, are those above referred to, stamped with the words "Steel Shod" in connection with the representation of an anvil. The case of P. Lorillard Co. v. Peper, 30 C. C. A. 496, 86 Fed. 956, referred to in counsel's brief as supporting its contention, is not applicable. That case having been tried below by me, I am quite familiar with the state of the pleadings therein. In that case between the time of filing the original bill, in which an injunction was denied, and the filing of the amended bill, on which the case was finally tried, the defendant had abandoned the first simulated trade-mark, and substituted another, which fact had escaped the attention of the complainant up to the time of the argument and final hearing. It was in that state of the case that the complainant insisted that the change made did not destroy the similitude, and therefore it was a continuing infringement, which existed at the time the amended bill was filed. That is not this case. Here the change was made after the suit was brought; and, even if the rule contended for by complainants' counsel could be applied to such a situation of the pleadings, there is no such resemblance between the alleged trade-mark of the complainants and the words "Steel Clad," stamped on the bottom of the defendant's present shoe, as would entitle the complainants to relief against it. The evidence shows that since the suit was brought the defendant has had its shoes manufactured with the words "Steel Clad" stamped on the shank, without employing the representation of an anvil, which designates the complainants' shoe. Such contention excites impatience. It seems to the court to carry the idea of a trade-mark beyond precedent or any reasonable necessity.

The court has not taken upon itself the burden of discussing and determining whether or not the complainants could appropriate to their exclusive use as a trade-mark the words "Steel Shod," used on a shoe with steel in the composition of the heel, as shown by

complainants' exhibit, for the obvious reasons hereinbefore stated. But when counsel go further, and insist that the words stamped on the bottom of defendant's shoe now in use, "Steel Clad," quilted with steel wires on the bottom, with prominent steel posts in the heel, are the equivalent of their stamp, the answer is that no one could obtain a trade-mark in the words "Steel Clad," even if other persons had employed them or their equivalent. In the first place, no trade-mark is predicable of words which are merely descriptive of the kind, nature, quality, or characteristics of the goods or articles manufactured or sold. This is especially so when such words are not intended by the manufacturer or vendor to perform any other office than to indicate the quality or character of the article. Marshall v. Pinkham, 52 Wis. 578, 9 N. W. 615; In re Anderson's Trade-Mark, 26 Ch. Div. 409; Street v. Bank, 30 Ch. Div. 156; Manufacturing Co. v. Trainer, 101 U. S. 51, 25 L. Ed. 993; Goodyear India Rubber Glove Mfg. Co. v. Goodyear Rubber Co., 128 U. S. 598, 9 Sup. Ct. 166, 32 L. Ed. 535; Larrabee v. Lewis, 67 Ga. 561; Van Beil v. Prescott, 82 N. Y. 630; Chemical Co. v. Meyer, 139 U. S. 540, 11 Sup. Ct. 625, 35 L. Ed. 247. "No principle of the law of trade-marks is more familiar than that which denies protection to any word or name which is descriptive of the qualities, ingredients, or characteristics of an article to which it is applied." Bennett v. McKinley, 65 Fed. 505, 13 C. C. A. 25. "Words belonging to the common stock of words may not be exclusively appropriated as a trade-mark." Clinton Metallic Paint Co. v. New York Metallic Paint Co. (Sup.) 50 N. Y. Supp. 437; Lamont v. Leedy (C. C.) 88 Fed. 72. What combination of words is more common, and the import of which is more universally recognized, than the words "Steel Clad"? The dictionaries, under the head of "Steel," say:

"Steel is often used in the formation of compounds, generally of obvious meaning, as steel-clad, steel-girted, steel-hardened, steel-plated, steel-pointed."

Such combined words are of the most obvious meaning. No person, seeing those words stamped upon the sole of a shoe, like that sold by the defendant, would for a moment imagine that they were a mere arbitrary symbol, indicating a trade-mark or ownership; but the purchaser would at once conclude that it was merely descriptive of the quality and characteristics of a shoe with quilted soles and prominent steel posts in the heel, indicative of strength and durability. Nor is it conceivable that a purchaser of common observation and common sense could mistake the words, plainly stamped, "Steel Clad," for the words "Steel Shod," and especially when the latter words are designated and pointed out by the accompaniment of an anvil. Nor is there any evidence in this case that any purchaser was deceived into purchasing defendant's shoe in the belief that it was of the complainants' manufacture.

If the complainants can maintain that "steel clad" is similar to "steel shod," with equal reason might it be said that they could exclude the use of the words "steel girted," "steel hearted," "steel plated," or "steel pointed," on shoes. The combined words are not the same in sound or in spelling. Carried to its logical sequence,

therefore, to sustain this contention of complainants, it would result that the complainants have acquired a complete monopoly in the word "steel," so that no other word could be used in combination therewith, even when employed merely as descriptive words. It would result in holding that, if the defendant were to have manufactured for sale a shoe with a composition of steel worked into the toe, he could not stamp on the bottom of the shoe the words "Steel Pointed"; or, if he were to have the heel of the shoe plated with steel, he could not stamp his shoe with the words "Steel Heel." While a court should be swift to prevent the pirating of one's property as a trade-mark, its zeal ought not to go to the extent of permitting one tradesman to pirate and appropriate to himself a common word of the English language, such as "steel," so as to prevent its use in connection with any other word by any other person; otherwise, one tradesman might appropriate to himself as a trade-mark the whole English language.

The injunction is refused, each party to pay its own costs.