NATIONAL WATERWORKS CO. OF NEW YORK v. KANSAS CITY.
KANSAS CITY v. NATIONAL WATERWORKS CO. OF NEW
YORK. COQUARD et al. v. BANNARD et al.

(Circuit Court, W. D. Missouri, W. D. December 1, 1896.)

Nos. 1,783, 1,868.

1. MORTGAGES TO SECURE BONDS—DUTIES OF TRUSTEE—AFTER-ACQUIRED PROPERTY.
   That a mortgage by a waterworks company to a trustee to secure an issue of bonds recites a purpose to extend the plant, and that it also contains a clause covering future-acquired property, and a covenant for further assurances, does not impose on the trustee a continuing duty to the extent of requiring it to take notice of what the mortgagor does with the money, or of the property which it purchases.

2. TRUSTS—PRIOR EQUITIES—NOTICE TO TRUSTEE—RIGHTS OF BENEFICIARIES.
   The doctrine that notice to the trustee is notice to the beneficiaries is of special significance only when the trustee is one of mutual selection by the grantor of the trust and the beneficiaries; and must not, when he is primarily a mere agent of the grantor, be applied so stringently as to defeat the equitable rights of the beneficiaries. Especially is this true when the beneficiaries are purchasers, from the trustee named in a mortgage, of negotiable bonds secured thereby, which were issued by the grantor to the trustee.

3. MORTGAGES TO SECURE BONDS—PRIOR EQUITIES—NOTICE TO TRUSTEE AND BOND-HOLDERS.
   The N. Water Co., owning a plant in Kansas City, Mo., mortgaged the same to a trust company, to secure an issue of negotiable bonds. The mortgage recited that the purpose of the loan was to extend the plant; and it contained a clause covering future-acquired property, and also a covenant for further assurances. The N. Co. bought all the stock of another water company (which subsequently became the K. Co.), having a plant in Kansas City, Kan., and, by connecting the same with the Kansas City, Mo., plant, reached a new source of supply. Thereafter the N. Co. caused the K. Co. to execute a mortgage to the same trust company on its plant in Kansas, to secure a new issue of negotiable bonds. *Held*, that innocent purchasers of these bonds were entitled to rely upon the fact that the record title to the plant in Kansas was in the K. Co., and were not chargeable with the knowledge which their trustee had, or might have had, that the property was equitably within the after-acquired clause of the mortgage given by the N. Co.

4. NOTICE FROM ADVERSE POSSESSION—JOINT POSSESSION.
   Before one can be deprived of rights based on the record evidence of title, on the ground of notice from adverse possession, it must appear that such possession was open, notorious, and unequivocal; and no joint and indefinite

possession, such as that of two corporations, one of which owns all the stock of the other, through officers, who are officers of both, is sufficient to give notice of the equitable rights of one as against the record title of the other.

Scammon, Crosby & Stubenrauch and H. A. Clover, for intervener.

George Hoadley, Karnes, Holmes & Krauthoff, and E. S. Hosmer, for Bannard committee.

BREWER, Circuit Justice. This matter comes before me on exceptions to the report of the master on the intervening petition of L. A. Coquard and others. The original suits were in equity, between Kansas City and the National Waterworks Company, in reference to the sale of the plant of the latter to the former. This litigation was protracted through several years, and the facts concerning it may be found fully stated in prior opinions. See 10 C. C. A. 653, 62 Fed. 853; 65 Fed. 691. By the terms of the final decree, entered on November 28, 1894, the city was ordered to pay $3,000,000 for the plant, and the company to convey a full and unincumbered title to the property. Both parties complied with the terms of the decree, and this intervention was an application of the interveners for a portion of the money paid by the city. It is unnecessary to repeat the whole story of the case; yet, in order to a clear understanding of the present question, some facts must be stated.

The contract, in 1873, between the city and the company, by which the latter constructed the plant, was made under express legislative sanction, so that all parties dealing with the company dealt with notice of the limits of power and right. At first the company drew its supply of water from the Kaw river, but, as the years passed, this became objectionable, and the company was constrained to look elsewhere. After examination, it determined to obtain it from the Missouri river, at Quindaro, on the Kansas side. In order to accomplish this, it was necessary to establish a reservoir and supply works at Quindaro, and carry the water by a flow line through the then Kansas towns of Wyandotte and Kansas City, Kan. There was in existence a Kansas corporation, known as the Wyandotte-Armourdale Water Company, with authority to supply the former place, among others, with water, which had constructed a system of waterworks, with a limited supply station, at the mouth of Jersey creek. The National Waterworks Company bought up the entire stock of this corporation, whose name was subsequently changed to that of the Kansas City Water Company. After this, it constructed a reservoir and supply station at Quindaro. About this time, Wyandotte, Kansas City, Kansas, and Armourdale were consolidated into one city, under the name of Kansas City, Kan. Through the streets of this city the National Waterworks Company carried the water to its distributing system in Kansas City, Mo., and at the same time, and from the same supply station, supplied water to Kansas City, Kan., in pursuance of the contract between the Kansas company and the town of Wyandotte. The land at Quindaro upon which the works were placed was purchased in

the name of B. F. Jones, the superintendent of the National Waterworks Company, who, on November 11, 1887, conveyed the property to the Kansas corporation, at the request and by the direction of the National Waterworks Company.

At the date of the decree, the property in Missouri and in Kansas belonging to the National Waterworks Company and the Kansas corporation was incumbered as follows: A mortgage on the Missouri property, executed by the National Waterworks Company, August 1, 1883, for $1,500,000; a mortgage, dated June 1, 1885, by the same grantor to the Central Trust Company, securing a like sum of $1,500,000; and a third mortgage, dated November 11, 1887, executed by the Kansas corporation to the Central Trust Company (the trustee in the second of the foregoing mortgages), for the sum of $900,000; or a total of $3,900,000. The decree required the conveyance of the Quindaro property and the flow line to the distributing system in Kansas City, Mo., as a part of the plant, within the terms of the original contract between the city of Kansas City, Mo., and the waterworks company, but it provided that the city should only pay $3,000,000 therefor. No question arose as to the necessity of paying the mortgage of August 1, 1883, and it was so done, which left a balance of $1,500,000 to be used in satisfying the two mortgages of June 1, 1885, and November 11, 1887, amounting to $2,400,000. The mortgage of November 11, 1887, was subsequent in date to that of June 1, 1885, but the property it covered was outside of Missouri, the legal title to which was not standing in the name of the National Waterworks Company, but which the decree required should be conveyed to Kansas City free of incumbrance. Negotiations were entered into with a view of effecting some arrangement by which, with the use of the $1,500,000, the two latter mortgages could be canceled. Messrs. Bannard and others, the defendants to this intervening petition, acting as a committee for and in behalf of the holders of 1,368 bonds of the mortgage of June 1, 1885, agreed that the $900,000 mortgage of November 11, 1887, should be paid in full, and the $600,000 remaining distributed among the 1,500 bonds of the mortgage of June 1, 1885, the balance due on such bonds to be secured by a mortgage on all of the property belonging to the Kansas corporation not conveyed under the terms of the decree to the city. The holders of the remaining 132 bonds, secured by that mortgage, declined to enter into this arrangement; and the petitioners, representing 101 of the bonds, intervened, as legally authorized by the terms of the decree, and claimed payment in full. In accordance with this arrangement, the $900,000 mortgage was paid in full, an amount retained in the registry of the court sufficient to pay the bonds of interveners in full, and the balance distributed among the holders of the 1,368 bonds; and the question is whether the holders of these 101 bonds are entitled to be paid in full, or must be content with the pro rata of the $600,000 reserved by the arrangement for the payment of the mortgage of June 1, 1885.

The master held that the mortgage of June 1, 1885, covered property secured by the mortgage of November 11, 1887, and, being prior

in time, gave priority of right, and that the holders of the 101 bonds were entitled to payment in full. It will be borne in mind that the legal title to the property in Kansas was in the Kansas corporation, and that the legal title to the property in Missouri was in the Missouri corporation, the National Waterworks Company. Did this mortgage of 1885 include the property in Kansas, and did the holders of bonds secured by the mortgage of November 11, 1887, take with notice of that fact? At the time of the execution of the mortgage of June 1, 1885, the National Waterworks Company owned none of the Kansas property. The mortgage recited that:

"The said party of the first part is desirous of obtaining the means of increasing and improving its supply of water, and extending and enlarging its works in the states of Kansas and Missouri, and for such purpose has resolved to issue its bonds, numbered consecutively from 1 to 1,500, both inclusive, amounting in the aggregate to the sum of $1,500,000."

### And the property assigned and conveyed is described as follows:

"All the rights, powers, privileges, and franchises granted to and conferred upon the said party hereto of the first part under and by virtue of the act of the general assembly of the state of Missouri and the ordinances of the common council of the city of Kansas hereinbefore recited, or which may hereafter be granted or conferred by said state or city; and also all rights, powers, privileges, and franchises which may have been granted and conferred upon said parties of the first part by the laws of the state of Kansas, or by the city of Kansas City, in said state, or which may hereafter be so granted and conferred, together with all the real estate and property, personal and mixed, now owned or which may hereafter be acquired by the said party of the first part situated in the said city of Kansas and Kansas City; and all erections and buildings and machinery, engines, reservoirs, pumps, wells, pipes, or other constructions, tools, implements, or fixtures, of every kind and nature, made, manufactured, constructed, built, laid, purchased, or in any way acquired in and about the construction, maintenance, and operation of waterworks in the cities aforesaid, or either of them; and also all the net income, rents, profits, emoluments, and money derived from the said waterworks, including any sum or sums of money which may be paid by the city of Kansas under and by virtue of the ordinances aforesaid, and including also any sum or sums of money which may be paid by Kansas City, in the state of Kansas, for water furnished to the last-mentioned city by the party of the first part; and also all the privileges, rights and franchises of the said party of the first part incident or appurtenant to or belonging to the said waterworks, or which it has acquired, holds, or owns in connection therewith, together with all and singular the tenements, hereditaments, and appurtenances thereunto belonging or in any wise appertaining, and the reversion or reversions, rent or rents, issues or profits, thereof; and also all estate, title, and property, possession, claim, or demand whatsoever, as well in law as in equity, of the said party of the first part of, in, or to the above-described premises, and every part and parcel thereof, with the appurtenances"

### And the covenant for further assurance is in these words:

"The said party of the first part shall from time to time, and at all times hereafter as often as thereto requested by the said Central Trust Company, its successor or successors, execute, acknowledge, and deliver all such deeds, conveyances, and assurances in the law for the better assuring unto the said Central Trust Company, its successor or successors in the trust hereby created upon the trusts herein expressed, the waterworks and appurtenances and the premises and property hereinbefore conveyed, or intended so to be conveyed, and all other property and things whatsoever which may be hereafter acquired for use in connection with the same or any part thereof, and all franchises now held or incident or appurtenant thereto or connected therewith, as by said Central Trust Company, its successor or successors, or its or their counsel learned in the law, shall be reasonably advised."

The ruling of the master was that as the mortgage of 1885 recited that the purpose of the loan was an extension of the waterworks plant, as it contained the "future-acquired" property clause, and a covenant for further assurance, the trustee in that mortgage had a continuing duty, and was charged with constructive notice of what the mortgagor did with the money which it received, of the extensions which it made to its plant, and that the property acquired by such extensions was in fact within the grant of the mortgage; that this constructive notice implied or was equivalent to full personal knowledge; and hence that, when it accepted the trust created by the mortgage of 1887, it did so with knowledge that the property was already covered by the prior mortgage; and, further, that the knowledge of the trustee was notice to those who purchased from it the bonds secured by this subsequent mortgage. The case, therefore, in his judgment, turned upon the question of constructive notice to the trustee, the extent to which it existed, the time which it lasted, and the rights which, in consequence thereof, purchasers of the second mortgage bonds acquired. He has argued this question with his usual force and ability, and, in order that his exact thought and conclusion may be presented, I quote what he says in reference to the matter:

"Although the mortgage of 1885, executed by the National Waterworks Company, was duly recorded in the state of Kansas, still, according to the records in the register's office, the title thereto was in the Kansas corporation when it executed the mortgage of 1887, securing the $900,000 of bonds. The mortgage of 1887 was the prior lien, unless it is shown that the holders of the bonds secured by that mortgage had or are chargeable with notice of the prior mortgage. The Central Trust Company of New York is trustee in both deeds of trust or mortgages, and accepted both trusts by signing those instruments. Being the party to the mortgage of 1885, it had, and was bound to have and take, notice of all the provisions therein contained. It had full and complete notice of the equitable rights of the holders of the bonds thereby secured when it accepted the trust of 1887.

"The question then arises whether notice to the trustee is notice to the holders of the bonds secured by the mortgage of 1887. It is said in Jones on Corporate Bonds and Mortgages, when speaking of the effect of notice to trustees in deeds of trust like the one in hand: 'Notice to the trustee is held to affect the title in their hands in reference to the incumbrances upon the trust property. Actual notice to the trustees of a prior equitable mortgage is notice of it to the bondholders, who therefore take their bonds subject to the legal consequences of the incumbrances.' Section 299. The case of Miller v. Railroad Co., 36 Vt. 452-484, is in point. The grounds upon which that case rests are these: Though such bonds are negotiable, and pass from hand to hand, they are purchased upon the security provided in the deed of trust. The security consists of such title as is vested in the trustee. The purchasers of bonds adopt the security as it exists in the trustee, and, by their purchase, make the trustee their agent, for the purpose of administering the trust. They therefore take such title, and only such title, as the trustee has. Equities which attach to the property in the trustee's hands continue to exist as against the bondholders. In the application of this principle of law, the case of Fidelity Ins., Trust & Safe-Deposit Co. v. Shenandoah Val. R. Co. (W. Va.) 9 S. E. 180, is like the one in hand. It is there said: 'It is a well-settled principle of law, and especially in this state and Virginia, that notice to a trustee is notice to his cestui que trust.' This West Virginia case was decided and followed in Peters v. Bain, 133 U. S. 670, 696, 10 Sup. Ct. 354, but it was decided and approved as being the law in that state. The facts in the case of Myers v. Ross, 3 Head, 59, were to the following effect: Ross executed a deed of trust to H. M. Myers, upon lands, to secure a debt due from Ross to Caroline Myers. This deed, although acknowledged, was not

recorded until about two years after its date. In the meantime Ross executed to two trustees a deed of trust upon the same land, to secure certain indebtedness of Ross to the Branch Bank. The evidence showed that the trustee had notice of the prior deed of trust. Says the court: 'The question now is whether the notice thus communicated by F. A. Ross, of the existence of the deed of Myers to John Netherland and Charles J. McKinney, was notice to the bank; and we are of opinion that it was. They were trustees in the deed for the benefit of the bank, and, as such, took the legal title to the estate. It is most manifest that the communication was made to them in relation to the very deed then about to be executed, for the benefit of the bank, and in which they were to and did become trustees; and we think both had the notice prior to the execution of the deed, but this is not material, since notice to one was effective as to both. They no doubt believed at the time, as did Ross himself, that he could in a short time adjust the debt with Myers, but this cannot impair the legal effect of the notice. It is difficult to perceive how the beneficiaries in a deed of trust can claim the equity of its provisions without being affected with a notice to the trustee of a prior incumbrance.' The case of Commissioners v. Thayer, 94 U. S. 631, to which I am cited as holding a contrary view, was in substance this: County bonds had been issued to a railroad company. The railroad company conveyed these county bonds and its railroad property to three trustees, to secure bonds issued by the railroad to the amount of $5,000,000. The trustees sued the county on over-due coupons attached to the bonds. It is insisted that there was no bona fide holding of the bonds because of certain transactions between the county commissioners and the railroad company, of which one of the trustees had notice. It was held that notice to one of the trustees was not notice to the holders of the mortgage bonds in that kind of a suit; citing Curtis v. Leavitt, 15 N. Y. 294. The bonds here in question, secured by the mortgage of 1887, are negotiable securities; and the principle of law is well settled that the assignee in such an instrument takes the security as incident, and he takes it just as he does the note or bond,—that is to say, free of equities existing between the original parties to the note or bond. But this case presents a very different question: Here the equities in favor of the 1885 bonds attach to the property before the date of the 1887 mortgage, and they existed in favor of persons not parties to the 1887 transaction. In this respect this case differs from the case of Commissioners v. Thayer, supra.

"As the trustee in this 1887 mortgage had full notice of the fact that the 1885 mortgage covered, and was intended to cover, all extensions of the Missouri plant, it took the property subject to the mortgage of 1885, and the 1887 bondholders have no greater rights than their trustees had. It is earnestly insisted that the trustee received the notice of the equitable rights in a prior and different transaction, and therefore should not be chargeable with notice in making this subsequent transaction. Trustees in deeds of trust like that of 1885 stand upon a very different footing from attorneys and like agents, because the trust is a continuing one. The trust of 1885 devolved upon the trustee many active duties. Among others, it was the duty of the trustee to call for, and have executed, all conveyances necessary and proper to bring this after-acquired property under that trust. It is, in my humble judgment, a great mistake to treat trusts like this as dry trusts. It is the business of the trustee to know the situation of the property, and to protect the security, and to carry out the trust in all its details, and these are continuing duties."

The question thus presented is of importance, not merely as it determines this particular controversy, but also as affecting many interests. There are in existence certain trust companies, who are engaged in the business of acting as trustees in mortgages, especially railroad mortgages. They are often trustees in successive mortgages from the same grantor, or from different corporations, having a common interest and control. Any question as to the extent of the notice which these trustees take of the transactions of their mortgagors, and the effect of such notice upon parties purchasing bonds from them, is of vast importance. I am unable to

78 F.—28

concur in the views of the master.   I do not think the duty of this trustee was a continuing duty to the extent that it took notice of whatever its mortgagor did with the moneys which it received upon the sale of the bonds, or of the property which it purchased. If there were such continuing duty, then included in it was the obligation to see that the mortgagor expended the moneys which it received in accordance with the expressed purpose of the mortgage, and to take legal measures to compel execution thereof, a failure to do which would make itself responsible to the parties purchasing bonds for all losses occasioned thereby.   There is in the mortgage no clause expressly casting such a duty upon the trustee.   It contains some 13 articles providing for certifying the bonds in the first instance, the keeping of a registry for the entry of transfers, and for action in case of a default in the payment of either principal or interest.   The only other article is the one containing the covenant for further assurance, heretofore quoted. Unless from it a duty of continuing supervision can be implied, the mortgage casts no such duty, although, as indicated, it specially provides for what the trustee shall do, and when it shall act.   Now, I think I am warranted in saying that a mere covenant for further assurance, such as is here found, has not been generally understood as casting a special duty upon the trustee of supervising the action of the mortgagor.   It must be borne in mind that the trustee was selected and the terms of the trust prescribed by the mortgagor alone, and that, until after the bonds were negotiated, it was acting only as the latter's agent.   It is true that, after the purchase of the bonds, the bondholders look to the trustee for the discharge of certain duties, but only such duties as it has promised to perform; and, to the extent that those duties inure to their benefit, they may properly hold it liable for any default therein.   If, by the terms of a mortgage, neither the interest nor the principal is payable at the office of the trustee, or through its agency, the bondholders, after purchase, deal directly with the mortgagor, and generally only in case of default do they invoke action on the part of the trustee. While it is often said that knowledge of the trustee is the knowledge of the cestui que trust, yet that doctrine is of special significance when the trustee is one of mutual selection by the grantor and the beneficiary of the trust, and must not, when he is primarily a mere agent of the grantor of the trust, be applied so stringently as to defeat the equitable rights of the beneficiaries.   Especially is this true when the beneficiaries are purchasers from the trustee of negotiable bonds issued by the grantor of the trust, for in such case the beneficiaries have a right to invoke the protection which attaches to negotiable paper.   Commissioners v. Thayer, 94 U. S. 631–644.

But whatever may have been the duty of the trustee in the mortgage of 1885 in respect to supervising the action of the mortgagor, and whatever may have been its breach of duty to the bondholders in that mortgage, and whatever of personal liability to such bondholders may accrue therefrom, a very different question arises when those bondholders invoke such breach of duty to displace the

bondholders under the mortgage of 1887 of rights created in reliance upon the facts shown of record.   Although the same party was trustee in both mortgages, it is not pretended that it had actual knowledge, when it took the mortgage of 1887 from the Kansas City Water Company, that the property upon which it was taking the mortgage was in fact the property of the National Waterworks Company, the grantor in the mortgage of 1885.   The claim is simply that it ought to have known the fact, and therefore had constructive notice thereof.   But it would be carrying the doctrine too far to hold that, when the bondholders purchased bonds secured by the mortgage of 1887, they were chargeable with knowledge, not only of all the facts that the trustee had knowledge of, but also of all facts which such trustee would have known if it had fully discharged its duty in a prior transaction between other parties. Surely, it cannot be successfully contended that one purchasing from a trustee under such circumstances is bound to take notice, not only of all that such trustee in fact knows, but also of all its past dealings with other parties, and whether in such dealings it performed its full duties to all the parties interested therein.   It must be borne in mind that the question now presented is not whether the trustee has been guilty of such a breach of duty as to become liable to the bondholders under the mortgage of 1885, but whether the bondholders of 1885 can rely upon such breach of duty to displace the priority which the record apparently gives to the bondholders of the mortgage of 1887.   I am of opinion that the bondholders under the mortgage of 1885 must look to the trustee for any loss they may have sustained by its breach of duty, if it were guilty of any breach, and that the bondholders of 1887 have a right to rely upon the record as it stood, and are not chargeable with the knowledge which its trustee, as trustee in another mortgage, might have acquired if it had discharged its full duty under the terms thereof.

Neither am I satisfied from the testimony that the National Waterworks Company had such possession of the property covered by the mortgage of 1887 as imparted notice, as against the record, of its equitable rights.   There was no exclusive possession.   It is true that its officers were controlling the waterworks plant, including therein the Kansas property; but its officers were officers of the Kansas corporation, and the possession of the property was as much that of the Kansas corporation as of the National Waterworks Company.   Before one can be disturbed of rights based upon the record evidence of title on the ground of notice from adverse possession, it must appear that such adverse possession was open, notorious, and unequivocal.   No joint and indefinite possession is sufficient to give notice of the equitable rights of one occupant as against the record title of the other.   Townsend v. Little, 109 U. S. 504, 3 Sup. Ct. 357; Kirby v. Tallmadge, 160 U. S. 379, 16 Sup. Ct. 349.

These considerations lead me to sustain the exceptions made by the Bannard committee to the report of the master in this case.   I have reached this conclusion with some hesitation.   When the

matter was first presented in argument, the question seemed to me easy of solution; but the more I have studied it, the more I have examined the able opinion of the master and the full and exhaustive brief of counsel for the interveners, the more I have been perplexed and embarrassed. Hence my delay in filing this opinion. The order will be that the exceptions to the report of the master are sustained; that the interveners be allowed to share in the arrangement made by the Bannard committee; and that the costs of this intervention be paid out of the funds retained in the registry of the court. With reference to the allowance to the master, if counsel do not agree upon the amount, I will fix it, after receiving any suggestions from either side.