## WESTINGHOUSE ELECTRIC & MFG. CO. v. BROOKLYN RAPID TRANSIT CO. et al.

## CENTRAL UNION TRUST CO. OF NEW YORK v. SAME.

(District Court, S. D. New York. August 22, 1922.)

1. **Mortgages ⬤⇒131—After-acquired property; equitable lien arises from promise to give lien.**

    An equitable lien in respect of after-acquired property grows out of the promise of the mortgagor that he will give a lien on such property when it comes into his possession.

2. **Courts ⬤⇒359—Effect of after-acquired property clause determined by local law.**

    The rights arising from a provision in a mortgage for a lien on after-acquired property and the extent and nature of such a lien are questions of local law.

⬤⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

3. **Chattel mortgages ⊂══▷18—After-acquired property clause ineffective against creditors as to personalty.**

It is the settled law of New York that a mortgage of after-acquired personal property is ineffective as against creditors of the mortgagor, and some further act is necessary in order to make it an effective lien as against creditors.

4. **Chattel mortgages ⊂══▷18—Subsequent mortgagees are "third parties" with rights of creditors as respects after-acquired property clause.**

Under the rule that a promise by a mortgagor to give a mortgage on after-acquired property will be given effect by a court of equity as an equitable mortgage only where the rights of third parties are not prejudiced thereby, holders of notes or bonds of a mortgagor corporation secured by a subsequent mortgage are "third parties," in the sense that creditors are third parties.

[Ed. Note.—For other definitions, see Words and Phrases, Second Series, Third Party.]

5. **Corporations ⊂══▷473—Purchasers of bonds not charged with notice of prior equitable liens.**

Purchasers of mortgage bonds of a corporation in the open market are not charged with notice of prior equitable liens on the mortgaged property not disclosed by the mortgage itself, or by the public records of incumbrances made by the mortgagor corporation.

6. **Corporations ⊂══▷473—Knowledge of mortgage trustee of prior equitable lien not imputable to purchasers of bonds.**

Knowledge by the trustee in a corporation mortgage securing bonds of a pre-existing equitable lien on the property mortgaged, which the holder had taken no steps to assert or enforce, does not charge purchasers of the bonds with notice of such lien.

In Equity. Suits by Westinghouse Electric & Manufacturing Company and by the Central Union Trust Company of New York against the Brooklyn Rapid Transit Company and others. On motion to determine priority of lien between mortgagees.

Abbreviations will be the same as those in 276 Fed. 152. Other abbreviations used will be obvious in the course of the opinion.

Larkin, Rathbone & Perry, of New York City (Henry V. Poor and James L. Banks, Jr., both of New York City, of counsel), for Central Union Trust Co. of New York, as trustee under the mortgage of New York Consolidated Railroad Co., dated February 1, 1913, and Cravath, Henderson, Leffingwell & De Gersdorff, of New York City (Paul D. Cravath, Robert T. Swaine, and Stephen A. Van Ness, all of New York City, of counsel), for committee of holders of notes and bonds secured by said mortgage, for the motion.

George S. Franklin, of New York City (H. Bartow, Farr, of New York·City, of counsel), for War Finance Corporation, for the motion.

Murray, Prentice & Aldrich, of New York City (George Wellwood Murray, Harrison Tweed and Henry C. Place, all of New York City, of counsel), for defendant Equitable Trust Co., of New York, as trustee under the first mortgage of Brooklyn Rapid Transit Co., dated October 1, 1895, opposed.

Carter, Ledyard & Milburn, of New York City (Walter F. Taylor and Roland L. Redmond, both of New York City, of counsel), for committee of bondholders of the Nassau Electric Railroad Co.; Stet-

⊂══▷For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

son, Jennings & Russell, of New York City (Allen Wardwell, of New York City, of counsel), for Guaranty Trust Company of New York, as trustee of the first mortgage of Brooklyn, Queens County & Suburban Railroad Co.; and Alexander & Green of New York City (W. W. Green, of New York City, of counsel), for committee of bondholders of the Coney Island & Brooklyn Railroad Co.—appearing solely in relation to the certificates of indebtedness.

William M. Chadbourne, of New York City, for committee of contract creditors.

MAYER, Circuit Judge. This is a motion made in a suit brought by Central Union Trust Co. to foreclose the mortgage of Municipal Co., dated July 1, 1912, and the mortgage of Consolidated Co., dated February 1, 1913. An order heretofore entered withdrew certain questions and issues from further consideration by the special master. This procedure was adopted mainly to avoid an elaborate proceeding if certain contentions prevailed, and was deemed advisable by court and litigants in order to save time and expense in a litigation which involves a very large sum, as well as the rights of probably thousands of security holders.

On a former motion, the court rendered its decision of October 6, 1921, reported in 276 Fed. 152, in which it considered at length the effect of the after-acquired property clause of the 1895 mortgage upon the property of B. R. T. and the relations of the 1895 and 1902 mortgages, particularly one to the other. The present motion is addressed to a different situation: It asks for an order establishing that the lien of the mortgage of Consolidated Co. is prior to the lien securing the payment of $14,344,974.96 to B. R. T., which indebtedness was part of the after-acquired property of B. R. T. to which Equitable Co., as trustee of the 1895 mortgage, contends the lien of the 1895 mortgage attached.

Consideration of the motion now to be decided requires an understanding of the financial structure involved and a discussion of certain vital questions of law. However, because certain questions have been eliminated for the purposes of this motion, the questions of law requiring determination are few, though sharply debatable. Preliminary to their statement, it is desirable to outline the essential facts.

B. R. T. was organized in 1896 as a business corporation to carry out the reorganization of the Long Island Traction Company. Until 1918, when it merged into itself the Transit Development Company, it was a holding company only. In 1895 the so-called 1895 mortgage was executed. By 1902, B. R. T. had grown to such an extent that it had acquired ownership or operating control of practically all of the companies owning or operating the street surface and elevated lines in Brooklyn. Further financing became necessary and the 1902 mortgage was the result. The mortgages of 1895 and 1902 have been so fully described in the opinion of this court in 276 Fed. 152, that reference thereto is made for brevity and to avoid repetition.

After 1902 there arose a system or practice of issuing so-called certificates of indebtedness. The practice was this: B. R. T. would ad-

291 F.—55

vance moneys to its controlled companies. These companies executed, and B. R. T. took, so-called certificates of indebtedness. A typical certificate read as follows:

### "Certificate of Indebtedness. No. VII.

"Brooklyn Union Elevated Railroad Company hereby certifies that for value received it is indebted to Brooklyn Rapid Transit Company in the sum of three hundred and seventy-one thousand, four hundred and thirty and $60/100$ ($371,430.60) dollars, which it agrees to pay on demand on presentation of this certificate properly indorsed, with interest at the rate of six (6) per centum per annum from the date hereof, to be paid semiannually on the 1st days of January and July in each year. The proceeds of this certificate of indebtedness have been used by the corporation executing this certificate in acquiring or improving the property hereinafter described, which is now held by said corporation in trust for the purposes hereinafter set forth, all of which expenditures are additional to those covered by certificates of indebtedness of said corporation, Nos. 1 to 6, inclusive. The following is a list of the property acquired for improvements made as aforesaid: [Description of property omitted.]

"This certificate is one of a series of certificates of indebtedness numbered consecutively from one upwards, heretofore issued and to be issued hereafter by Brooklyn Union Elevated Railroad Company, deposited and to be deposited by the Brooklyn Rapid Transit Company with Central Trust Company of New York, trustee, under the provisions of the mortgage of Brooklyn Rapid Transit Company to the Central Trust Company of New York, dated July 1, 1902. It is agreed between the holder of this certificate and the said Brooklyn Union Elevated Railroad Company that all of the property described in said certificates so deposited shall be held in trust by said Brooklyn Union Elevated Railroad Company for the payment of said certificates of indebtedness. The holder of this certificate consents that the Brooklyn Union Elevated Railroad Company may sell at any time any or all of said property described in this or any other of said certificates, and that any such sale shall free the property sold from the lien or interest of the holder of any of said certificates.

"Brooklyn Union Elevated Railroad Company hereby agrees not to mortgage or in any other way incumber said property without the consent of Central Trust Company of New York, trustee, so long as this or any other of said certificates shall be unpaid, and that when and as any of all of said property shall be sold the proceeds thereof from time to time will be applied by said Brooklyn Union Elevated Railroad Company, at its option, either to the payment of said certificates in their numerical order or to the purchase or improvement of other property which shall be held by said company in trust for the payment of said certificates, and a schedule thereof shall be set forth in a subsequent certificate of this series to be deposited as aforesaid.

"In witness whereof. Brooklyn Union Elevated Railroad Company has caused these presents to be executed by its vice president and its corporate seal to be hereunto affixed and attested by its secretary this 1st day of August, 1907."

All the certificates, including those here in controversy, were deposited with the 1902 mortgage trustee, and none had been acquired out of the proceeds of the bonds issued under the 1895 mortgage. None had been in the possession of the 1895 mortgage trustee, nor had any demands nor inquiry in respect thereof been made by the 1895 mortgage trustee. By 1912, B. R. T. had acquired and deposited with the 1902 mortgage trustee securities in the aggregate of more than $45,000,000, of which upwards of $42,800,000 were certificates of indebtedness. The aggregate book value of the assets of B. R. T. had reached about

$100,000,000, and the capitalization, including stocks and bonds, was about $86,000,000.

This constantly growing enterprise, however, was further enlarged by the events surrounding the development of rapid transit facilities. During the earlier part of 1912 there was allotted to B. R. T. the part it now has in the dual subway system, contemplating a contract with the city of New York whereby the proper subsidiary of B. R. T. should equip the new rapid transit lines to be constructed and owned by the city, reconstruct and improve its own elevated lines, and operate the whole as a system. It was then estimated that the capital expenditures required for this purpose would be approximately $60,000,000. The arrangements made with the bankers and the carrying out of these arrangements are fully and carefully set forth in the record by Mr. A. M. Williams, to which reference may be had for the details.

B. R. T. owned these elevated lines, namely, Brooklyn Union Elevated Company, Sea Beach Railway Company, and Canarsie Railroad Company. The plan contemplated the consolidation of these three elevated companies, and this was accomplished; the three consolidated companies forming the present corporation, known as New York Consolidated Railroad Company. The consolidation was evidenced by an appropriate agreement dated October 22, 1912, and filed and recorded November 30, 1912.

B. R. T. was also to organize a corporation which was to enter into the contract with the city of New York for the equipment and operation of the city-owned lines in conjunction with the existing elevated lines owned by Consolidated Company. This new corporation was incorporated on September 27, 1912, and is known as New York Municipal Railway Corporation. All the stock of the Municipal Co. was owned by Consolidated Co., and practically all of the stock of Consolidated Co. is owned by B. R. T. When B. R. T. arranged for the financing necessary to enable entrance into the new rapid transit field, the certificates of indebtedness on deposit with the 1902 trustee included $10,601,252.92 of certificates of indebtedness of the three elevated companies; i. e., Brooklyn Union, Sea Beach, and Canarsie. Except for Brooklyn Union certificate No. 4 (which represented loans originally made to the Brooklyn Heights Co.), these certificates represented loans by B. R. T. to the respective subsidiaries to reimburse their treasuries for expenditures claimed to have been previously made for capital purposes. The Sea Beach and Canarsie certificates were secured by unrecorded mortgages, but the remaining certificates were not secured by any mortgage or pledge, but only by such lien, if any, as was created by the certificates themselves. The certificates of indebtedness of the three elevated companies became the obligations of the Consolidated Company by virtue of the consolidation. During the interval between the execution of the contract with the city and the mortgage of the Consolidated Company, infra, an additional $3,743,722.04 of certificates were issued by Consolidated Company itself and deposited and pledged with the 1902 mortgage trustee. The total, therefore, of the certificates supra issued by the three elevated companies and by the Consolidated Co. and then on deposit with the 1902 mortgage trustee, was $14,344,974.96.

These certificates, aggregating the amount just mentioned, constitute the subject-matter of the present controversy. Ahead of them were three old underlying mortgages on the elevated lines, aggregating $23,-000,000. It was, of course, plain that it would be necessary to raise the large sum of money required for the new venture by B. R. T. into the rapid transit field from the investing public, and when B. R. T. in June, 1912, closed arrangements with its bankers to provide the needed amount, B. R. T. agreed to create and the bankers to purchase $40,-000,000 of six-year 5 per cent. gold notes of B. R. T., to be secured by the pledge of a like principle amount of first mortgage 5 per cent. bonds to be issued by the new company (Municipal Co.) organized to make the subway contracts with the city, and also by the pledge of $10,000,000, of B. R. T. first refunding mortgage bonds, the bankers also acquiring an option upon an additional $20,000,000 of these notes. The bonds were to be secured by a first lien on the property of Municipal Co. and a direct lien on Consolidated Co., subject only to the prior underlying mortgages, aggregating $23,000,000, referred to supra. The Municipal Co. was to be the maker of the bonds, and the Consolidated Co. was to evidence its obligation thereon by an indorsed guaranty.

The actual financing was done by the sale of $60,000,000 of B. R. T. five-year notes secured by the pledge of the $60,000,000 of bonds. All of these notes were sold and all are outstanding, except $2,265,000, which were converted into bonds of the Municipal Co., guaranteed, as above stated, by Consolidated Co. The entire bond issue is therefore outstanding (except for a very small amount repurchased for the sinking fund), either directly in the hands of the public, as in the case of $2,265,000 thereof, or as security for B. R. T. notes so outstanding, as in the case of the remaining $57,735,000.

In order that the new bonds might be secured by a first lien upon the elevated lines and other property of Consolidated Co., subject only to the underlying mortgages aggregating $23,000,000, it was necessary to free the property of the lien of the Consolidated Co.'s certificates of indebtedness (including the Sea Beach and Canarsie unrecorded mortgages) which were then outstanding and on deposit with and in the possession of the 1902 mortgage trustee as stated supra. Following the decision of the New York Court of Appeals (206 N. Y. 110, 99 N. E. 241), holding the proposed subway contracts valid, B. R. T., on September 23, 1912, adopted resolutions authorizing the execution of the trust agreement dated July 1, 1912, and the authentication and delivery of $40,000,000 of the 5 per cent. notes thereunder, and on October 1, 1912, this was done.

As provided in the trust agreement, the proceeds of the notes were deposited with the trustee thereof, to be turned over to the trustee under the mortgages to be executed by the subway company and the Consolidated Company when created, and to be then used for carrying out the program of construction and equipment under the subway contracts, which included a large amount for the reconstruction and improvement of the existing elevated lines. To make good the promises upon which it had sold its notes, it became necessary for B. R. T. to arrange for the cancellation of the old certificates of indebtedness, which, ir-

respective of their legal status, were in any event clouds upon the first lien of the new mortgage to be executed by Consolidated Co. To accomplish this it was necessary that the B. R. T. should secure their release from the 1902 mortgage by substituting other security at least equal in value. What happened follows:

Pursuant to an agreement between B. R. T. and Consolidated Co., dated March 26, 1913, and authorized by resolutions adopted by B. R. T. and Consolidated Co. on that date, Consolidated Co. executed a new certificate of indebtedness, dated April 1, 1913, for the aggregate of the old certificates; i. e., $14,344,974.96. The new certificate undertakes to pledge the stock of Municipal Co. and also to create a general lien, subject to the new mortgage (executed on March 31, and recorded on April 1, 1913) and to the underlying mortgages, upon all of the properties of the Consolidated Co. then owned. The resolutions adopted by the B. R. T. directors declared that in the judgment of the board the value of this new certificate was at least equal to the aggregate value of the old certificates.

This new certificate was delivered to B. R. T., which gave Consolidated Co. a check for the aggregate amount. At the same time Consolidated Co. gave B. R. T. a check for a like amount, expressed to be in payment of the old certificates. The new certificate was pledged with the 1902 mortgage trustee, and it thereupon transferred and delivered by way of release the old certificates to the Consolidated Co. These were physically canceled by having the words "Paid and Canceled" stamped on their faces and holes punched through the signatures. The mortgages securing the Sea Beach and Canarsie certificates were contemporaneously formally released. All this was done on April 4, 1913.

When this exchange had been accomplished, the bonds secured by the new mortgage of Consolidated Co. (recorded April 1, 1913) were delivered to the trustee under the trust agreement of the B. R. T., dated July 1, 1912, and the proceeds of the 5 per cent. notes issued thereunder were turned over to the mortgage trustee, to be used to perform the subway contracts with the city, executed March 19, 1913. The 5 per cent. notes were bearer securities, intended to circulate in the market, and were promptly listed on the Exchange, to be dealt in by the public.

Three years later, 1918, the 5 per cent. notes came due and were taken care of by the issue of the present 7 per cent. notes, also bearer securities, listed on the Exchange, and in connection with that transaction nearly $7,000,000 of new money was put in by the War Finance Corporation. The new certificate for the $14,344,974.96, representing the aggregate of the old Brooklyn Union, Sea Beach and Canarsie certificates and of the Consolidated Co. certificates mentioned supra, is known as the certificate of indebtedness, Number 1 of Consolidated Co. The bankers with whom the contract was made and who purchased the $40,000,000 of notes first issued, as well as the additional $20,000,000 issued in 1915, were Kuhn, Loeb & Co., Kidder, Peabody & Co., and Central Trust Company of New York.

Passing now from the foregoing outline of the undisputed transactions, certain other facts may briefly be referred to.

Central Trust Co. was the original trustee of the 1895 mortgage and was ultimately succeeded by Equitable Trust Co., which is now the trustee. Central Trust Co. was also the trustee under the 1902 mortgage and the Municipal Co. and Consolidated Co. mortgages. Central Trust Co. was also one of the group of bankers which purchased the entire issue of notes secured by bonds as set forth supra.

The first step of any kind taken by the 1895 mortgage trustee was a formal demand upon B. R. T. and Garrison, as receiver under date of July 16, 1919, requiring the delivery of all after-acquired properties of B. R. T. There is no evidence that Equitable Trust Co. had any notice or knowledge of the certificate No. 1 Consolidated Co. transaction. Equitable Co. bought $225,000 of the 5 per cent. notes on October 1, 1912, and $100,000 of the $20,000,000 issue. This was qua financial institution and qua trustee.

There is no suggestion that any one acted with lack of good faith.

Rightly or wrongly, those responsible for the certificate No. 1 transaction doubtless thought that the 1895 mortgage did not reach the old certificates through its after-acquired property clause, and were concerned only with the rights, duties, and obligations of the 1902 trustee under the 1895 mortgage. Nor is there any suggestion that with actual notice or knowledge Equitable Co. sat idle while the transaction was being carried on and consummated.

The following concessions for the purposes of the argument by those supporting the motion simplify the consideration of the questions involved:

"Upon the present motion none of the following questions are before the court:

"(1) The construction of the after-acquired property clause of the 1895 mortgage of the B. R. T. For the purpose of the present motion we accept the construction which this court has already given to that clause in its decision of October 6, 1921.

"(2) The rights of the B. R. T. noteholders as creditors of the B. R. T., the present inquiry being confined to the priority of the lien of the mortgage of the Consolidated Company securing the issue of $60,000,000 of bonds.

"(3) The extent to which the expenditures represented by the certificates of indebtedness in question were made from the proceeds of the sale of B. R. T. first refunding bonds secured by the mortgage of 1902 and would therefore come under the prior lien of that mortgage, under the doctrine laid down by this court in the latter part of the above mentioned opinion of October 6, 1921.

"(4) The character, validity, and extent of the lien of the original certificates of indebtedness that were merged into the Consolidated Company's certificate of April 1, 1913, for $14,344,974. This is relevant upon the present motion only so far as the fact that serious questions exist colors the transactions had in 1913."

In view of these concessions the following must be accepted for the purposes of this decision: (1) That the 1895 trustee had an equitable lien on the old certificates, and hence (2) that, if these certificates were in existence and in the possession of the 1902 trustee, the 1895 trustee could now assert such lien and obtain a decree declaring the certificates to be under said lien prior to the lien of the 1902 mortgage.

Brushing aside form, as distinguished from substance, the certificate No. 1 transaction must be stripped of any semblance of payment off or satisfaction. What happened must be regarded as nothing more nor less than the imposing of a first lien in favor of Consolidated Co. in place of the first lien in favor of 1902 mortgage on certificates and unrecorded mortgages in the possession of the 1902 trustee and free of the equitable lien of the 1895 mortgage trustee not in possession.

This, then, leads to a consideration of three major questions: (A) The status of the equitable lien of the 1895 mortgage as against the bondholders and noteholders; (B) whether these bondholders and noteholders are "third parties;" and (C) whether knowledge of the Central Trust Co. was knowledge by or notice to the bondholders and noteholders under the Consolidated Co. mortgage. These major questions necessarily involve subsidiary discussion, which will appear hereinafter.

[1] A. An equitable lien in respect of after-acquired property, such as here concerned, grows out of the promise of the mortgagor that he will give a lien upon such property when it comes into his possession. For general definitions see 25 Cyc. 665.

[2, 3] The rights springing up under such promises and the extent and nature of such a lien are questions of local law. Thompson v. Fairbanks, 196 U. S. 516, 25 Sup. Ct. 306, 49 L. Ed. 577; Pintsch Compressing Co. v. Buffalo Gas Co. (C. C. A.) 280 Fed. 830. The New York courts have recognized and applied the rule laid down in Pennock v. Coe, 23 How. 117, 16 L. Ed. 436. As summarized in the Pintsch Case, supra:

"It is, of course, settled that the New York rule is that a mortgage of after-acquired personal property is ineffective as against creditors of the mortgagor, *and some further act is necessary in order to make it an effective lien as against creditors.* (Italics mine.) Zartman v. First National Bank, 189 N. Y. 267, 82 N. E. 127, 12 L. R. A. (N. S.) 1083; Titusville Iron Co. v. City of New York, 207 N. Y. 203, 100 N. E. 806. This general rule has been followed in this circuit. In re P. J. Sullivan Co., 254 Fed. 660 at page 662, 166 C. C. A. 158; Westinghouse, etc., v. B. R. T. (C. C. A.) 263 Fed. at page 537."

The exception to the foregoing rule now recognized as applicable to public utility corporations does not here apply, for the 1895 mortgage was not a railroad mortgage, but was executed by a business corporation, acting only as a holding company. If, then, the noteholders and bondholders of Consolidated Co. are in the same position as creditors, then their rights are superior to the equitable lien which the 1895 mortgage had as against the certificates in possession of the 1902 mortgage trustee.

[4] B. In some of the cases the expression "third parties" is used, and counsel urging the motion at bar contend that these cases are authority for the proposition that "third parties" means some parties other than creditors provided such parties are not the mortgagor and mortgagee. An illustration is found in Zartman v. First National Bank, 189 N. Y. 267, 272, 82 N. E. 127, 128 (12 L. R. A. [N. S.] 1083), where Judge Vann said:

"It is only when the rights of third parties will not be prejudiced that equity, treating as done that which was agreed to be done, will turn a con-

tract to give a mortgage on property to be acquired into an equitable mortgage on such property as fast as it is acquired, and enforce the same accordingly against the mortgagor, his representatives and assigns. In other words, the agreement and intention of the parties to a mortgage upon property not yet in existence will be given effect by a court of equity so far as practicable, provided no interest is affected except that of the mortgagor and mortgagee, who entered into the stipulation, but equity closes its doors and refuses relief if the interests of creditors are involved."

It must frankly be noted that, in this and other cases, the courts were dealing with the rights of creditors, and in speaking of "third parties" the expression must be construed as referring to creditors, even though the broader proposition stated by way of dictum may be regarded as sound. In some respects, therefore, the case at bar is one of first impression, except in regard to the effect of the knowledge of Central Trust Co., as trustee under the various mortgages, a point dealt with infra. But, on principle, why are not the noteholders and bondholders (hereinafter for brevity called bondholders), whose rights are here concerned, "third parties" in the full sense in which creditors would be third parties?

[5] Courts must understand the known facts of daily life and daily transactions. In a bond issue of the character necessary to finance the subway enterprise, the resulting securities are normally held by the public, which normally purchases these securities in the open market; i. e., ordinarily via the stock exchanges here and abroad. In the absence of such constructive notice as may be required under recording acts, how far must the purchaser of such securities inquire in order to determine whether or not a chose in action is subject to some equitable lien of a previous mortgage?

If notice is a material element, there is nothing in the Consolidated Co. mortgage itself which put the purchaser of these securities on notice. If such purchaser had examined that mortgage, he would have found from the terms thereof that it was a lien upon the properties therein set forth, subject only to the three underlying mortgages, aggregating $23,000,000. As well stated in the brief of counsel, referring to inquiry of investors:

"Their inquiry, if any were made, would naturally not extend beyond the property of the Consolidated Company itself and the action of the Consolidated Company in respect thereof. In searching the title of the Consolidated Company's property, either by going to the public offices where mortgages of real or personal property are recorded or filed, or to the archives of the Consolidated Company, the only liens on the Consolidated Company's property of which they would learn would be recorded mortgages and the certificates of indebtedness in question, which describe the liens by which they were secured. When it was found that the holders of those certificates had surrendered them to the Consolidated Company in exchange for new certificates which expressly recognize the priority of the new mortgage (except in respect of the stock of the Municipal Company), there would be every ground for the inference that the intended subordination had taken place."

Fully as much as the creditors of a mortgage, a security holder such as those here concerned is in every sense a third party. He becomes the owner of the security by purchase or otherwise after the mortgage has been executed and the bonds have been issued. It would, indeed,

be a grave obstruction to this character of business and finance if the security of a bondholder was impaired because of transactions which destroy or unfavorably affect an equitable lien in respect of which the equitable lienor has taken no steps to enforce his lien.

It was the very large investment of the investing public in these securities which enabled the so-called B. R. T. system to enter into and develop its part of the subway enterprise. The courts necessarily must recognize that the rights of those purchasing securities through the ordinary channels and by ordinary methods in the open market should not be impaired by failure to act in enforcing equitable liens, as in the instance of the 1895 mortgage, on the one hand, or by an error, if such it were, in the action taken as in the case of the 1902 mortgage, on the other hand.

The doctrines calculated to protect creditors, of which the Zartman Case, supra, is an illustration, really sprang up from the requirements of business, from the need of furnishing and supplying persons and corporations with such merchandise or other articles as they might need, unembarrassed by the fear that precedence would be given to unenforced and unheard of equitable rights. By the same token, the same safeguards should be thrown around holders of bonds of the character here involved. In no other way can great transactions necessary to the business welfare of the community or nation be carried on, and, if the bondholders in the case at bar and in any similar situations were not held to be "third parties," the law would erect a serious obstacle to the development of the railroad and industrial enterprises, requiring the confidence of the investing public, not only in the business merits of the enterprise, but also in the legal soundness of the issued security.

[6] C. But it is urged that the knowledge of Central Trust Co. in the various capacities in which it acted is knowledge imputable to the bondholders. There may be laid aside at once any knowledge which Central Trust Co. had in its capacity as one of the banking syndicate. Certainly no bondholder buys his securities in the expectation that knowledge of some legal defect otherwise not ascertainable happens to have come to the banker who sells the securities to the public. The serious results which would flow from charging the purchaser of securities with such knowledge are too obvious to require elaborate statement, and courts do not, nor, in any event, should not, lay down rules which would be detrimental to the conduct of legitimate business.

In considering the effect of the knowledge of Central Trust Co. in its other capacities, it must always be remembered that this is not a controversy between the 1895 trustee and the 1902 trustee, nor between the bondholders of the 1902 mortgage and the trustee of the 1902 mortgage. Notice to the Consolidated Co. trustee could not have been possible prior to March 31, 1913, the date of the execution of Consolidated Co. mortgage. The old certificates of indebtedness were surrendered by the 1902 mortgage trustee in exchange for the new certificates No. 1 of the Consolidated Co. on April 4, 1913. There is nothing in the record to indicate the receipt of notice of this transaction by the Consolidated Co. trustee between April 1 and April 4,

1913, or at any time subsequent thereto, and, in any event, it is questionable whether the Consolidated Co. trustee was called upon to look further than section 5 of article 1 of the 1902 mortgage, which section provides that the refunding bonds there referred to may be used—

"for the purpose of acquiring by purchase, exchange, or otherwise, stocks, bonds, securities, or other property of any kind whatsoever which the Transit Company shall be legally authorized at the time to purchase or acquire. * * *. All of the stocks, bonds, securities, and other property acquired by the Transit Company with the bonds or the proceeds thereof, so authenticated and delivered, for any of the purposes mentioned in this section, when conveyed, delivered, transferred to, or deposited with the trustee as aforesaid, shall become and be subject to the lien hereof as fully and completely as though specifically described herein as being mortgaged or pledged herein."

But let it be assumed that the Consolidated Co. trustee had notice of the transaction as well as the 1902 trustee, then the question arises whether notice to or knowledge of the trustee of the existence of a pre-existing unenforced equitable lien binds the bondholders. Without out analyzing at length the few cases upon this subject, it is plain that there is a conflict of view between Miller v. Rutland R. R. Co., 36 Vt. 452, on the one hand, and Commissioners of Johnson County v. Thayer, 94 U. S. 632, 24 L. Ed. 133 and Curtis v. Leavitt, 15 N. Y. 9 and 194, on the other. The Miller Case proceeds upon the theory that the trustee is the agent of the bondholder, so that the bondholder is charged with the knowledge of the trustee as to an existing equitable right, claim or lien. The substance of the Miller Case is stated by the court in the following language:

"We are unable to assent to the proposition that the trustees are only agents of the cestuis que trust for holding the legal title. They are agents for holding just such title as is created by the transaction, and for administering it according to the terms of the trust; and whatever title the cestuis que trust have, whether legal or equitable, is through, and in virtue of, the title conveyed to and held by the trustees."

In discussing what the court calls "the practicableness of a contrary doctrine" it said:

"On the other hand, it would be easy comparatively for persons, desirous of investing in railroad mortgage bonds, to apply to the trustees holding the security, and elicit the true state of the title. We think it no hardship that they should be required to do so, if they would avoid the hazard of finding their security subject to prior incumbrances, when it might be too late to save themselves from the consequences of such a state of the title."

This case was decided in 1863. There had been no such development of railroad and similar mortgages and of very large financial institutions as has since taken place. Nothing in modern times can be less practicable than that thousands of security holders should make personal application to a trustee and elicit from him or it by parol statement an elaborate account of everything of every kind or description which had taken place prior to the mortgage and which might affect title. Under modern requirements, financial operations of this importance and magnitude could not be carried on if personal knowledge of the trustee were to be charged against the bondholders, and if the bondholder were to be burdened with the duty of eliciting such knowledge from the trustee.

It is true that Curtis v. Leavitt, supra, was an earlier case. The New York Court of Appeals, true to its traditional appreciation of the methods whereby trade, commerce, and finance are carried on in the big world, laid down the sensible and workable rule which was so definitely approved in the Thayer Case in the following language:

"The question then arises whether notice to óne of the trustees in this deed of trust is notice to the holders of the mortgage bonds in such manner that, in a suit by the trustees to enforce payment of the county bonds, the character of a bona fide holder without notice is lost. In Curtis and others v. Leavitt, 15 N. Y. 194, the court say: 'If Graham, one of the trustees, was chargeable, as director of the company, with knowledge that there had been no previous resolution, notice to him was not notice to his cestuis que trust. He did not stand to them in the relation of an agent. He was selected and appointed as a trustee by the company, not by the cestuis que trust. His powers and duties were prescribed by the company, not by the bondholders. There were, at the time of the execution of the trust deeds, no bondholders, no cestuis que trust. It is a necessary attribute of an agency that it should be created by the principal. * * * In this case, as the relation of principal and agent did not exist between the bondholders and Graham, notice to him, or knowledge by him, that there was no previous resolution, was not constructive notice to the bondholders.' And again, on the page following, it is said: 'The trustees are not to be regarded as the agents of the purchasers of the bonds and mortgages assigned to them. No consideration proceeds from them. They were mere assignees of those securities, coupled with no interest, in trust to hold them as security for the payment of all the mortgage bonds that should thereafter be sold or negotiated by the company. * * * Whoever purchased the mortgage bonds became purchasers of the bonds and mortgages so assigned as security for their payment, or of an equitable right to hold them as such security.' We think this is sound doctrine, and that it establishes the proposition that notice to Thayer did not operate to destroy the bona fide holding of the bondholders under the deed of trust in which he was named as one of the trustees."

Not only from a practical standpoint is the rule of the Thayer Case sound and here decisive, but it is fair in balancing equities. In the case at bar, bondholders came forward with large sums of money which enabled an enterprise of great magnitude to be put into active operation and did this upon the faith, inter alia, of security secured to them by an instrument as formal as the Consolidated Co. mortgage, whereas, on the other hand, the 1895 mortgage trustee took no steps whatever to safeguard its rights as against new possible investment. See, also, National Waterworks Co. v. Kansas City (C. C.) 78 Fed. 428; Central Trust Co. of New York v. C. H. & D. Ry. Co. (C. C.) 169 Fed. 466.

The able counsel who represent the contending interests in the case at bar have presented argument on other points and cited many cases. Failure to discuss these arguments and cases is not due to any lack of appreciation of their possible importance, but within the reasonable limits of an opinion it is enough if decision can be placed upon the more important grounds, and, in order that there may be no question as to the court's view, it may be unequivocally stated, first that the bondholders are third parties, and at least in the same category as creditors; and, secondly, that knowledge by the Central Trust Co. in any of its capacities did not constitute knowledge by or notice to the bondholders of the equitable lien of the 1895 mortgage.

It may be added that, once the trustee undertakes his duties, he may be the agent of the bondholders for various purposes set forth in the mortgage. There are often administrative details with the performance of which the trustee is charged. Many of these are set forth in article 1 et seq. of the Consolidated Co. mortgage; but as affecting bondholders there is a marked difference between the agency of the mortgage trustee to carry out the mandates of the mortgage and the knowledge which the trustee may have gained as trustee or in some other capacity as to unenforced equitable liens upon property not in the possession of him who is entitled to enforce or perfect his lien.

The motion is granted, and a decree may be submitted on five days' notice.

⊚⟹For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes